In the

# United States Court of Appeals

## For the Seventh Circuit

No. 16-1577

MICHAEL KOZIARA,

*Plaintiff-Appellee,*

*v.*

BNSF RAILWAY CO.,

*Defendant-Appellant.*

Appeal from the United States District Court for the
Western District of Wisconsin.
No. 13 C 834 — **James D. Peterson**, *Judge.*

ARGUED SEPTEMBER 20, 2016 — DECIDED OCTOBER 31, 2016

Before BAUER, POSNER, and EASTERBROOK, *Circuit Judges.*

POSNER, *Circuit Judge.* The Federal Railroad Safety Act forbids a railroad to discharge or otherwise discriminate against an employee for conduct protected by the Act, including notifying the railroad that he has suffered a work-related injury. 49 U.S.C. § 20109(a), (a)(4). The plaintiff in this case was employed by BNSF Railway Company, the second-largest North American freight railroad, and brought this suit against the railroad for violating the provisions of the

Railroad Safety Act that we just cited. A jury returned a verdict in favor of the plaintiff and awarded him damages, and the defendant, having failed to persuade the district judge to award judgment to it despite the jury's verdict, has appealed.

The plaintiff was a track foreman supervising crews of 50 to 100 employees responsible for track maintenance. The company required employees to "be careful to prevent injuring themselves" and (what seems equivalent) not to be "careless of the safety of themselves." In addition the railroad makes theft a ground for dismissing an employee and goes further by stating that it has "a zero tolerance policy for theft" and indeed "in all cases" the "sanction [for theft] ... is dismissal ... regardless of [the employee's] length of service" or "the monetary value of whatever was stolen."

On September 9, 2010, the plaintiff was supervising a crew assigned to remove and reinstall crossing planks on a segment of the railroad's line. Crossing planks are pieces of timber installed at railroad crossings to enable cars and trucks to drive over the tracks. They are fastened to the track bed by means of large wooden screws called "lags" that are removed with a hydraulic tool before a crossing plank is lifted (the purpose of lifting the crossing plank being to allow maintenance work on the track). On the day in question the crew had difficulty removing one of the planks in the usual way, and with the plaintiff's approval a member of the crew named Zielke used a front-end loader—a tractor-like vehicle equipped in this instance with a forklift that could be used to pry a plank loose without removing any of the lags—to remove the plank. The procedure caused the plank to fly loose

just as the plaintiff was walking into the center of the track, and to strike one of his legs.

Though at first he thought he'd just bruised his leg, several days later he went to his doctor and learned that he'd fractured his tibia (shinbone). After first lying to two of his coworkers that he'd been injured at home, on advice of a union official and a lawyer affiliated with the union he told his supervisor, Veitz, that he'd been injured by the plank and was going to fill out an injury report. Veitz told him to submit the report to someone in management, which he did. The company accepted the report and paid his medical bills.

BNSF has a policy of investigating all reported injuries by staging a reenactment of the accident in order to learn how it happened. Veitz staged the reenactment and concluded that the plaintiff had been careless in walking into the crossing in which the front-end loader was busy trying to remove the plank, thus placing himself in danger of being hit by the plank as it came off the ground—and hit he was.

A week after the reenactment a member of the crew that the plaintiff had been supervising told Veitz that he thought the plaintiff might have been injured ten days before the front-end loader fiasco—while removing railroad ties from railroad property. (Railroad ties typically are wooden strips laid underneath and horizontal to the rails to provide support for them.) Veitz requested a preliminary investigation of the theft allegation, which concluded that theft charges were warranted. Pursuant to the railroad's collective bargaining agreement with the plaintiff's union, the company conducted a formal investigation presided over by railroad managers who'd been trained to serve as hearing officers and had not themselves been involved in the alleged mis-

conduct of the employee being investigated. Actually there
were two investigations: one of the plaintiff's taking the rail-
road ties without permission and the other of his careless-
ness with regard to the front-end loader—carelessness that
had resulted in the medical expenses that the railroad had
paid and did not seek, and has not sought, reimbursement
for from him. For his carelessness (which had cost the com-
pany the medical expenses), the company decided that a 30-
day suspension would be adequate punishment. But that
decision quickly became moot because the company also de-
cided that he should be discharged because of the theft, con-
sistent with the company policy that we quoted earlier.

Although at the hearing the plaintiff argued that Veitz
had given him permission to take the ties, which he planned
to give to a friend who had a farm, Veitz testified that he'd
never given such permission. It would have been especially
irresponsible for Veitz to have given permission because the
railroad ties were soaked in creosote, and as another manag-
er at BNSF testified without contradiction, "we do not give
or sell creosote products to employees or the general public
and there's reasons for it. That's bold letters. We don't do it."
There are indeed reasons—compelling ones. As the U.S. En-
vironmental Protection Agency explains, "products contain-
ing creosote as the active ingredient are used to protect
wood against termites, fungi, mites and other pests that can
degrade or threaten the integrity of wood products. These
treated wood products are used in outdoor settings such as
*in railroad ties* and utility poles. ... [But] creosote is not ap-
proved to treat wood for residential use, including landscap-
ing timbers or garden borders," because materials coated
with creosote can be hazardous (emphasis added). EPA,
"Creosote," www.epa.gov/ingredients-used-pesticide-

products/creosote (visited Oct. 28, 2016, as were the other websites cited in this opinion); see also Agency for Toxic Substances & Disease Registration, Toxic Substances Portal—Creosote, "Public Health Statement for Creosote," www.atsdr.cdc.gov/phs/phs.asp?id=64&tid=18. To allow the plaintiff to carry off creosote-treated railroad ties to a farm, where they could do real damage, would have exposed the railroad to litigation and Veitz to the risk of a swift firing.

One would have expected the plaintiff, with his extensive experience as a track foreman, to have known better than to give creosote-soaked railroad ties to a farmer, thereby compounding his theft. And that the theft had been discovered in the course of an investigation triggered by the injury report obviously did not prevent the railroad from concluding that he had stolen the ties. For "once an employer learns about employee wrongdoing that would lead to a legitimate discharge, we cannot require the employer to ignore the information, even if it is acquired during the course of discovery in a suit against the employer" or, we add, in the course of some other procedure, including an investigation. *McKennon v. Nashville Banner Publishing Co.*, 513 U.S. 352, 362 (1995).

Both the Railway Labor Act, 45 U.S.C. § 153(i), and the railroad's collective bargaining agreement with the plaintiff's union, entitled him to appeal the 30-day suspension, plus his discharge from the railroad's employment, to the National Railroad Adjustment Board (NRAB), an arbitral body established pursuant to the Act. The plaintiff did appeal, and the union supported him, but the Board denied both appeals, remarking that the railroad had proved that the plaintiff had "failed to be alert and attentive when he did

not safely remove a crossing board" and that the plaintiff had "failed to prove that … Veitz gave him permission to remove the ties."

Having struck out with the NRAB, the plaintiff filed a complaint with OSHA, but OSHA rejected his complaint on the same grounds on which the adjustment board had rejected it. (OSHA, the acronym for the Occupational Safety and Health Administration, is of course employee-friendly.) The plaintiff appealed OSHA's finding, which was preliminary. But because OSHA did not issue a final administrative decision within 210 days after his initial complaint, see 49 U.S.C. § 20109(d)(3), he was allowed to file this lawsuit, and did, though not till three years after the accident. Much of the delay, however, was attributable to an OSHA investigation that though protracted found no wrongdoing on the part of the railroad.

The suit accuses the railroad of having retaliated against the plaintiff in violation of the Federal Railroad Safety Act, which as we noted earlier forbids a railroad to retaliate against an employee (as by firing him) for his having notified the railroad that he has suffered a work-related personal injury, incurring medical expenses that the railroad might be required to cover. The railroad might also be required to report the injury to the Federal Railroad Administration, which regulates railroad safety. See U.S. Dept. of Transportation, Federal Railroad Administration, "Railroad Safety," www.fra.dot.gov/Page/P0010. But the parties do not tell us whether the injury to the plaintiff in this case had to be—or was—reported to the FRA. The plaintiff's medical expenses were below the applicable threshold, see 49 C.F.R. § 225.19(e), and though it is not entirely clear whether the

threshold is applicable to physical injuries as distinct from damage to equipment, the rail bed, etc., the better interpretation is that it is indeed applicable to personal injuries rather than to equipment, because there is a separate schedule of reporting thresholds for equipment damage. See 49 C.F.R. § 225.19(c).

A further complication worth at least brief notice is introduced by the Federal Railroad Administration's FORM FRA F 6180.55a, 49 C.F.R. § 225.21(c), "Railroad Injury and Illness," which like the regulation we cited earlier lists requirements for reporting work-related injuries to the FRA. But again it is uncertain whether the plaintiff's injury was required to be reported. The form treats x-rays and also "soft" restraints, which might well include a walking boot, as "first aid," which doesn't have to be reported. The plaintiff had an x-ray and was given a walking boot; that was the extent of his medical treatment—indicating by the way that it was a mild fracture. See Dr. David Geier, "Tibia Fractures" (Jan. 18, 2011), www.drdavidgeier.com/tibia-fractures. Dr. Geier mentions a walking boot as a treatment for a mild tibia fracture (if it's not mild, you can't walk; Koziara walked).

Another regulation, 49 C.F.R. § 225.12, addresses what are called "human factor" injuries—and Koziara was the human factor, having caused his injury by his carelessness, which is why he was given the 30-day suspension. While a possible motive for retaliation against an injured employee would be the railroad's interest in reducing its potential liability for employees' medical expenses, there is no indication that the decision to fire the plaintiff was related to the railroad's having paid his medical expenses. To fire an otherwise satisfactory employee for an accident that not only im-

posed a trivial cost on BNSF but would not get the railroad in trouble with the regulatory authorities wouldn't make sense. In contrast, to fire him for stealing railroad property—potentially poisonous railroad property because consisting of creosote-soaked railroad ties—made sense.

The slightness of the medical expenses makes it unlikely that the railroad would have gotten into trouble with the Federal Railroad Administration by filing an injury report, or for that matter by not filing such a report (we don't know whether BNSF filed a report of the accident with the FRA.) Although the plaintiff's medical expenses are not in the record, they could not have exceeded $600, as the boot would have cost only $100 and the x-ray no more than $500 and those were the only medical treatments the plaintiff received. These costs were peanuts to BNSF, now a wholly owned subsidiary of Berkshire Hathaway, Warren Buffett's company—and a subsidiary worth many billions of dollars.

It's true that if a jury finds that an employer's explanation for an adverse employment action is false, it may infer that the employer's real reason for the action was unlawful. See *St. Mary's Honor Center v. Hicks*, 509 U.S. 502, 511 (1993). But to have found that the plaintiff's carelessness and theft were pretexts for firing him on a forbidden ground, the jury would have had to find that BNSF had lied about the reason for the action it took against him. And the plaintiff presented no evidence of that. He claims that Veitz lied about giving him permission to remove the ties, but does not claim that the *railroad* believed that Veitz had lied in reporting the plaintiff for having stolen the railroad ties, yet fired him in spite of knowing that Veitz had lied. If the railroad had

thought Veitz had tried to frame a worker, Veitz would have been forced to walk the plank, not the victim of his lie.

A plaintiff is master of his case. Koziara *could* have argued pretext, but chose instead to rest on the contention that he should be deemed to have won his suit just because the railroad never would have discovered the theft had he not filed an injury report (which led to the investigation, which led to the discovery of the theft). He chose his ground, and it is a legally bad one because the filing of the report was not a proximate cause of his being fired; having failed to make a backup pretext argument, he does not get a do-over.

The plaintiff had to show that his injury report was a "contributing factor" in his being fired. 49 U.S.C. §§ 20109(d)(2)(A)(i); 42121(b)(2)(B)(i). He never showed that, but the judge thought that, as a matter of law, he had, and narrowed the jury questions accordingly, resulting in the verdict in his favor that the railroad challenges. The judge remarked that the plaintiff's "injury report *initiated* the events that led to his discipline, and was therefore a contributing factor to the adverse actions that he suffered" (emphasis the judge's). But in so remarking he failed to distinguish between causation and proximate causation. The former term embraces causes that have no legal significance. Had the plaintiff never been born or never worked for BNSF he would neither have been hurt by the plank flung at him by the energetic front-end loader nor have stolen railroad ties from the railroad. But that doesn't mean that his being born or his being employed by the railroad were legally cognizable causes of his being fired.

Proximate causation in contrast creates legal liability, "proximate" denoting in law a relation that has legal signifi-

cance. There are different definitions of "proximate cause," however, and in *CSX Transportation, Inc. v. McBride*, 131 S. Ct. 2630, 2638 (2011), a case under the Federal Employers' Liability Act, the Supreme Court rejected a definition that required that the defendant's negligence be "the sole, efficient [or immediate] producing cause" of the injury in order to be actionable. That would be a pertinent consideration in this case were the plaintiff arguing that he was injured by the negligence of his employer, but he is not arguing that. He caused himself to be injured by being careless, and to be fired for stealing railroad property—causal acts that the law deems to have legal consequences if the conduct in question—in this case carelessness and theft—is lawfully forbidden, as it was by a combination of the railroad's announced employment policies and the terms of its collective bargaining agreement with the union that represents employees such as the plaintiff.

The Federal Railroad Safety Act does not punish railroads for disciplining (including firing) employees unless the discipline is retaliatory. There is no evidence of that in this case—no evidence of the usual forms of employment discrimination, certainly, and no evidence that the suspension and discharge of the plaintiff were motivated by animus. It is true that a workman who was standing near the plaintiff when the plank soared was not disciplined for carelessness; but he wasn't injured at all, which allowed the company to infer that he wasn't careless, or at least not sufficiently careless to warrant an investigation. As for the argument in the plaintiff's brief that it was "common for employees to take used railroad ties" without being disciplined for doing so, the record contains no instances of BNSF's declining to discipline an employee who was found to have taken

ties without permission. The plaintiff does not argue that BNSF believed that *he* was permitted to take the railroad ties, in which event the stated reason for his being fired would have been pretextual.

The district judge's remark that the plaintiff's injury report to the company had initiated the events that led to his being fired and therefore had contributed to it is a further example of confusing a cause with a proximate cause. The plaintiff's having been born was an initiating event without which he would not exist, but obviously an event devoid of legal significance. Veitz agreed that the plaintiff should submit an injury report, but based his conclusion that the plaintiff had been careless not on the report, which merely described the injury, but on the reenactment of the accident—and the reenactment, which was the proximate cause of the decision to suspend the plaintiff, had no connection to the injury report, which merely described medical treatment—not carelessness and not theft.

And by the way there is nothing sinister, as the term "initiating event" may seem to suggest, in deeming the submission of an injury report a proper occasion for an employer's conducting an investigation. An injury report is a normal trigger for an investigation designed to uncover facts that can prompt corrective action that will reduce the likelihood of a future injury.

In addressing the parties' motions for summary judgment, the district judge made some legal rulings intended to narrow the issues for trial. The critical ruling—a grant of partial summary judgment in favor of the plaintiff—was that the injury report was a "contributing factor" to his being fired. In *Ortiz v. Jordan*, 131 S. Ct. 884, 888–89 (2011), the Su-

preme Court held that an order denying summary judgment can't be appealed after a full trial on the merits has been held. "The order retains its interlocutory character as simply a step along the route to final judgment. Once the case proceeds to trial, the full record developed in court supersedes the record existing at the time of the summary judgment motion." *Id.* at 889 (citation omitted). A grant of partial summary judgment is similarly just a way station en route to a final judgment. The grant of partial summary judgment in this case narrowed the case, as the district judge believed, to two issues for trial. The first was whether the injury report had been prepared and submitted by the plaintiff in good faith, and the second whether the railroad would have fired him had he not filed it. And on both those issues the jury sided with the plaintiff. Rightly on the first issue; there is no indication that the injury report was not submitted in good faith—the plaintiff had after all been injured, and the report described the injury accurately.

But as for the second issue—whether the railroad would have terminated the plaintiff had he not made an injury report—the answer was yes (not no, as the jury thought), because there is no evidence that the railroad's decision to fire him was related to his having made the report. So one sees that the district judge's "contributing factor" ruling on summary judgment misled the jury. The railroad provided unrebutted evidence that it believed that the plaintiff had stolen the ties, and the plaintiff points to no evidence that BNSF would fail to fire an employee whom it discovered to have stolen from the company and no evidence that BNSF disbelieved Veitz's account.

BNSF thus proved its affirmative defense to the charge that it fired the plaintiff because he filed (with his superior's agreement) an injury report citing negligible medical expenses. Consistent with language in its rules of employment quoted earlier, the company appears to have a firm policy of firing employees discovered to have stolen company property. What it does not have, so far as appears, is a policy of singling out for discipline an employee who submits an injury report. There is no basis in the record for supposing that had the plaintiff not submitted an injury report but BNSF had nonetheless discovered the stolen railroad property, he wouldn't have been fired. Therefore we needn't give the plaintiff a do-over trial.

We end by expressing doubt that the plaintiff should have been entitled to bring this lawsuit at all. For remember that he did so years after he had struck out first with the arbitral board (the National Railroad Adjustment Board), which ruled that he'd "failed to prove that ... Veitz gave him permission to remove the ties," and then with OSHA, which rejected his complaint on the same grounds on which the adjustment board had rejected it. Ordinarily arbitration is final; having lost to the arbitrator or arbitrators, you can't restart the entire process by suing. We don't say the plaintiff was *precluded* (by some doctrine of preclusion, such as res judicata) from suing, only that the kind of protracted litigation that he initiated and pursued is suggestive of desperation rather than of merit.

We conclude that the judgment must be reversed with instructions to dismiss the suit.