# United States Court of Appeals

## For the Eighth Circuit

_____

No. 15-2905

_____

Paul Gunderson

*Plaintiff - Appellant*

v.

BNSF Railway Company

*Defendant - Appellee*

_____

Appeal from United States District Court
for the District of Minnesota - Minneapolis

_____

Submitted: October 19, 2016
Filed: March 10, 2017

_____

Before LOKEN, SMITH, and COLLOTON, Circuit Judges.

_____

LOKEN, Circuit Judge.

Paul Gunderson appeals the district court's[1] grant of summary judgment dismissing his complaint alleging that BNSF Railway Co. violated the Federal Rail Safety Act ("FRSA"), 49 U.S.C. § 20109, when it fired Gunderson in 2009 for

---

[1]The Honorable Patrick J. Schiltz, United States District Judge for the District of Minnesota.

harassing a co-worker and threatening a supervisor. Gunderson alleges that the real reason for his termination was unlawful retaliation for his prior FRSA-protected activity, an injury report and years of safety advocacy. A Department of Labor ("DOL") administrative law judge ("ALJ") dismissed Gunderson's FRSA complaint on the merits following extensive discovery and a six-day evidentiary hearing. Gunderson then filed this *de novo* action under the FRSA's "kick-out" provision, 49 U.S.C. § 20109(d)(3). The district court denied BNSF's motion to dismiss but, at the end of discovery, granted BNSF summary judgment on the merits and dismissed Gunderson's complaint with prejudice. Reviewing the grant of summary judgment *de novo*, we affirm.[2]

## I. Background.

**A. The Disciplinary Backdrop.** Gunderson worked for BNSF at its yard in Willmar, Minnesota, as a brakeman, conductor, switchman, and remote-control operator, from 1989 until BNSF terminated him in August 2009 for harassing and intimidating a co-worker and threatening a supervisor. Gunderson was active in Local 1177 of the United Transportation Union ("UTU"), becoming local chairman for the Willmar Yard in 2005, and also serving as vice general chairman of the international union. His union duties included representing fellow workers in Willmar accused of rules violations. After Michael Babik became Superintendent of Operations in Willmar in 2008, Gunderson and Babik met almost weekly regarding labor-management issues, causing tension at times.

---

[2]Prior to oral argument, the Association of American Railroads ("AAR") filed a contested motion for leave to file a brief as *amicus curiae* in support of BNSF. We took the motion for consideration with the case and now grant AAR leave to file its brief. See F.R.A.P. Rule 29.

In March 2009, two Willmar co-workers, Mitchell Duke and Robert Cluka, complained that yardmaster David Peterson had improperly obtained and published their personnel information. BNSF served Peterson with a Notice of Investigation. When Gunderson told Babik he was thinking of representing Peterson, Babik allegedly said, "stay away from this . . . if you get involved you could be next." Gunderson believed that Babik was angry because Gunderson and another union official, Steve Mace, "keep beating the carrier" in investigations.

**B. First Investigation of Gunderson.** In May 2009, Local 1177 president Doug Campen informed Babik that Gunderson and Mace were pressuring union members Duke and Cluka to recant their allegations against Peterson. Campen said Gunderson had used "intimidation and scare tactics," telling Duke he should be "very nervous." Campen also said that Mace had asked Cluka to withdraw his statement against Peterson. Babik immediately notified his supervisor, Twin Cities Division General Manager Richard Ebel, who obtained written statements from Duke, Cluka, and Campen.

Duke's statement accused Gunderson of saying that "things could get really bad" if Duke did not withdraw his accusations against Peterson -- Duke could face a lawsuit by Peterson and could be fired. Gunderson also advised that Duke could get a large settlement from BNSF over a previous injury if Duke "played his cards right." Gunderson invited Duke to his house, where Gunderson gave Duke a letter to sign recanting his allegations against Peterson. Duke reported that someone had placed garbage in his pickup truck and filled its gas tank with diesel. Duke stated, "I am concerned for my safety at work, I'm afraid there will be retaliation by other union members and Gunderson." Cluka's statement alleged that he encountered Mace in a grocery store, asked for general advice about serving as a witness in a disciplinary hearing, and was asked by Mace to recant his accusation against Peterson.

Based upon these statements, Ebel decided to investigate Gunderson and Mace for violating Rule 1.6 of BNSF's General Code of Operating Rules[3] and its Violence in the Workplace Policy, which prohibits threatening behavior, including "verbal, nonverbal, or written threats or intimidation, explicit or subtle." Before proceeding, Ebel contacted James Hurlburt, director of employee performance, who was in charge of reviewing BNSF disciplinary actions nationwide to ensure consistent application of the company's Policy for Employee Performance and Accountability (PEPA). Hurlburt, stationed in Fort Worth, Texas, had no prior contact with Gunderson. He recommended initiating an investigation and removing Gunderson from service due to the "egregious" level of harassment alleged, and because of the "incredibly unusual" situation presented by a union president bringing to management a complaint against a union member. Milton Siegele, in BNSF's labor relations department, concurred. With the approval of his supervisor, Ebel then issued Notices of Investigation to Gunderson and Mace and withheld both from service pending the investigations.

**C. Second Investigation.** Ebel directed Willmar Terminal Manager Herbert Beam to serve Gunderson with the Notice of Investigation and ordered BNSF resource protection officers to be present because of the volatile situation at the Willmar Yard. Officers Eric Collins and Scott Poundstone, who had never heard of Gunderson or his protected activities, traveled to Willmar and waited across the hallway from Beam's office, out of sight but where they could hear the conversation, while Beam delivered the Notice to Gunderson. After receiving the Notice, Gunderson told Beam, "Herb, you know, I'm not just a local [union] chairman. . . . Sometimes things can come back to hurt you." When Beam returned to his office after escorting Gunderson from the building, the security officers said

---

[3]Rule 1.6 provides that "[a]ny act of hostility [or] misconduct, . . . affecting the interest of the company or its employees is cause for dismissal and must be reported."

he needed to write a statement describing what they regarded as a threat by Gunderson. Beam sent an email describing the incident to Babik and Ebel, and Ebel received a formal report from Collins and Poundstone confirming Beam's account. Steven Klug, Senior Vice President of Human Resources, read this description and concluded it warranted additional investigation as an "intentional attempt to intimidate and threaten." Hurlburt and Siegele advised this was a serious event warranting separate investigation. Ebel served a second Notice of Investigation.

**D. Disciplinary Hearings.** BNSF's collective bargaining agreement with UTU provided that the company must prove disciplinary violations at a formal adversarial hearing. At a meeting to prepare for Gunderson's separate hearings, one officer noted, "we above all want Gunderson," referring to the seriousness of his alleged misconduct, compared to Mace's. The first hearing, on August 12, 2009, concerned Gunderson's alleged harassment of Duke. Witnesses included Gunderson, Campen, Duke, Babik, Peterson, and Mace. Gunderson denied harassing Duke, claimed that Duke approached him asking for help in recanting, but admitted that he delivered the recantation letter to Duke as a favor to Peterson's attorney. Duke testified, consistent with his written statement, that Gunderson pressured him to recant on multiple occasions, and that he suffered panic attacks and dreaded coming to work as a result of the harassment. The second hearing, concerning the alleged threat against Terminal Manager Beam, was held the next day. Beam, Collins, and Poundstone testified that Gunderson told Beam that the investigation could come back to hurt Beam, and each testified that he interpreted this as a threat. Gunderson testified that he could not remember whether or not he made the statement to Beam. After each hearing, the hearing officer sent the transcript and record to Ebel for a decision whether BNSF had proven each of the alleged disciplinary violations.

**E. Dismissals.** Ebel reviewed the records and transcripts and decided that BNSF proved both charges -- Gunderson engaged in a "serious event of intimidation and harassment" against Duke and threatened Beam. Ebel decided that dismissal was

warranted for each violation. Ebel sought advice from Hurlburt and Siegele and his supervisor; they reviewed the records and recommended dismissal for each charge. On August 25, 2009, BNSF issued two separate dismissal letters to Gunderson, one for harassing Duke and one for threatening Beam. Ebel denied Gunderson's request to reconsider the decision. The UTU appealed Gunderson's discharge to BNSF Labor Relations, arguing that the work rules in question did not apply to his contacts with Duke away from the workplace, and that "all of the multiple charges leveled against Mr. Gunderson were unwarranted and unsubstantiated." BNSF denied the internal appeals. Gunderson also appealed to BNSF's PEPA Board, which reviewed his discipline for company-wide consistency and upheld the decision.

**F. Railway Labor Act Appeal.** The UTU on behalf of Gunderson then appealed both rulings and his discharge to the Public Law Board (PLB), a three-person arbitration panel established under the Railway Labor Act and comprised of a carrier member, union member, and neutral member. Gunderson argued that the "real reason" behind BNSF's investigation was that Gunderson's activity in representing members as a union officer "placed him in an adversarial relationship with [BNSF, which does] not like to be challenged." The PLB denied both claims, concluding BNSF's evidence was sufficient to support the charges. Though Gunderson had a protected interest in representing and counseling union members in investigations, the PLB ruled, his conduct in harassing and intimidating Duke "went beyond the bounds of such protected [union] activity to that of interfering with the proper conduct of a company investigation by harassing and intimidating a complainant and company witness."

**G. FRSA Complaint.** In November 2009, Gunderson filed a timely[4] complaint with the Secretary of Labor, alleging for the first time that his discharge

---

[4]An employee alleging an FRSA violation must first file a complaint with the Secretary of Labor within 180 days. 49 U.S.C. §§ 20109(d)(2)(A)(ii).

was unlawful retaliation for his repeated complaints about safety problems at the Willmar Yard and for filing an injury report in September 2008 after he injured his shoulder at work. See 49 U.S.C. § 20109(a)(4), (b)(1)(A); Kuduk v. BNSF Ry., 768 F.3d 786 (8th Cir. 2014). The Occupational Safety and Health Administration (OSHA) investigated and issued written findings and a preliminary order rejecting Gunderson's complaint on September 9, 2010. See 29 C.F.R. § 1982.104 (2011). Noting that "engaging in protected activity does not shield an employee from any and all subsequent disciplinary action," OSHA concluded that there was "no reasonable cause" to believe BNSF violated the FRSA in dismissing Gunderson.

The FRSA "kick-out" provides that, if the Secretary of Labor fails to issue a final decision within 210 days, the complainant may remove the dispute to federal court by filing an original *de novo* action. 49 U.S.C. § 20109(d)(3). Gunderson's "kick-out" right accrued on June 23, 2010, 210 days after he filed his administrative complaint. Instead of filing a lawsuit, Gunderson pursued his administrative complaint on October 13, 2010, by filing objections to OSHA's preliminary order with DOL's Office of Administrative Law Judges, requesting a full *de novo* hearing.

With his complaint pending before the ALJ, Gunderson engaged in extensive document production and depositions until the end of discovery in November 2011. The ALJ conducted a six-day evidentiary hearing in January and March 2012 and issued a fourteen-page decision on January 10, 2014, dismissing Gunderson's claim on the merits. The ALJ concluded: "[I]t is clear to me that Mr. Gunderson's raising safety concerns played no part in BNSF's decision to terminate him." The DOL regulations then in effect[5] provided that the ALJ's decision would become the

---

[5]DOL published an interim final rule on August 31, 2010. See Procedures for the Handling of Retaliation Complaints, 75 Fed. Reg. 53527 (Aug. 31, 2010) (codified at 29 C.F.R. Part 1982). In 2015, DOL published its final rule after notice and comment. See Procedures for the Handling of Retaliation Complaints, 80 Fed. Reg. 69115 (Nov. 9, 2015) (codified at 29 C.F.R. Part 1982).

Secretary's final order unless Gunderson petitioned for review by DOL's Administrative Review Board within ten business days. 29 C.F.R. § 1982.110(a) (2011). The regulations further provided that the claimant has a "kick-out" right only "[i]f there is no final order of the Secretary." 29 C.F.R. § 1982.114(a).

## II. This Lawsuit.

Gunderson filed this action nine business days after receiving the ALJ's decision, without petitioning for further review, and more than three-and-a-half years after he acquired the right to abandon the administrative proceedings and file a "kick-out" action. He again alleged that BNSF fired him in retaliation for engaging in FRSA-protected activity. BNSF moved to dismiss, arguing that Gunderson waived his right to bring a *de novo* action in federal court by actively litigating his claim in an administrative forum for over four years. The district court converted the motion to dismiss into a motion for summary judgment because BNSF submitted portions of the administrative record, see Fed. R. Civ. P. 12(d), and denied the motion. Noting it had "a great deal of sympathy for BNSF's argument" because permitting Gunderson to proceed in federal court after pursuing the administrative process almost to its conclusion was "extremely wasteful," the court concluded it was "constrained to hold that Gunderson has not waived his statutory right to file this action." Gunderson v. BNSF Ry., 29 F. Supp. 3d 1259, 1262, 1264 (D. Minn. 2014). After the court declined to certify an interlocutory appeal, the parties engaged in substantial discovery.

To prevail on his FRSA retaliation claim, Gunderson must prove, by a preponderance of the evidence, that "(i) he engaged in a protected activity; (ii) BNSF knew or suspected, actually or constructively, that he engaged in the protected activity; (iii) he suffered an adverse action; and (iv) the circumstances raise an inference that the protected activity was a contributing factor in the adverse action." Kuduk, 768 F.3d at 789. If Gunderson makes that showing, BNSF can avoid liability

-8-

if it "demonstrates, by clear and convincing evidence, that [it] would have taken the same unfavorable personnel action in the absence of [Gunderson's protected activity]." 49 U.S.C. § 42121(b)(2)(B)(ii). At the conclusion of discovery, the district court reviewed the lengthy record and granted BNSF's motion for summary judgment. The court ruled that Gunderson made a sufficient showing he engaged in protected activity, BNSF knew of that activity, and he suffered an adverse action.[6] However, the court concluded, (i) Gunderson did not present sufficient evidence to permit a reasonable jury to find that FRSA-protected activity was a "contributing factor" to his discharge, and (ii) alternatively, BNSF proved by clear and convincing evidence that it would have dismissed Gunderson regardless of his protected activity.

## III. The Merits.

On appeal, Gunderson argues there is evidence in the summary judgment record permitting a jury to find that FRSA-protected activities were a contributing factor in his discharge: (i) he was a prominent safety advocate at the Willmar Yard for the eight or nine years prior to termination, serving during his last year on the Willmar Yard site safety committee; (ii) though he suffered no prior adverse action for his many safety complaints,[7] supervisors Babik and Beam were openly hostile, with Beam expressing the view that his job would be easier if Gunderson were not around because he was unwilling to let go of safety matters, and Babik referring to

---

[6]On appeal, BNSF does not contend that Gunderson presented insufficient evidence to avoid summary judgment on those elements of his retaliation claim.

[7]The complaints included safety problems caused by snow build-up in the yard, leading BNSF to shut down the yard in December 2007; complaints that BNSF was not performing newly required air tests, prompting BNSF to conduct these tests; repeated complaints of inadequate lighting in the yard, ultimately causing BNSF to install $250,000 of new lighting equipment; and other unsafe working conditions. Gunderson raised these issues at safety meetings and in emails to General Manager Ebel and Terminal Manager Beam.

Gunderson's lighting complaints as "whining"; (iii) though Babik insisted that Gunderson fill out an injury report after hurting his shoulder at work, see 49 C.F.R. § 225.19(d) (2015), Beam and Babik were hostile toward him because supervisors' bonuses depended in part on the number of injuries suffered in their territory; (iv) decision-maker Ebel attended meetings where Gunderson raised safety complaints; (v) Beam and Babik participated in the decision-making process; (vi) BNSF served its Notice of Investigation on Mace by certified mail, but served the first Notice of Investigation on Gunderson personally, with surveillance, resulting in the second investigation;[8] and (vii) BNSF disciplined the similarly situated Mace less severely, an inconsistent application of its "zero tolerance" for workplace harassment.

At issue is the fourth element of Gunderson's retaliation case, whether his protected activity was a contributing factor in his discharge. To avoid summary judgment on this element, he must submit sufficient evidence of "intentional retaliation prompted by the employee engaging in protected activity." Kuduk, 768 F.3d at 791. A "contributing factor" includes "any factor which, alone or in connection with other factors, tends to affect in any way the outcome of the decision." Id. In considering this element, we must take into account "the evidence of the employer's nonretaliatory reasons." Palmer v. Canadian Nat'l Ry., ARB No. 16-035, 2016 WL 5868560, *33 (DOL Admin. Rev. Bd. Sept. 30, 2016).

In reviewing this issue, five highly relevant facts stand out. First, the disciplinary investigations that led to Gunderson's discharge were "completely unrelated" to his protected activity. Kuduk, 768 F.3d at 792. Second, Gunderson's prior safety-related activities were remote in time and disconnected from the disciplinary proceedings by an "intervening event that independently justified adverse

---

[8]BNSF explained that Gunderson was working on the day the Notices issued while Mace was on vacation.

disciplinary action" -- union president Campen complaining to management that two members were being harassed. Id.; see Feldman v. Law Enf't Assocs. Corp., 752 F.3d 339, 348 (4th Cir. 2014) ("causal connection may be severed by the passage of a significant amount of time, or by some legitimate intervening event"). Third, Gunderson was discharged after disciplinary hearings at which he was represented by union counsel, and the decisions to discharge were upheld by BNSF internally and by a Railway Labor Act arbitration panel. Fourth, the merits of the discharge were again reviewed in a six-day hearing before a DOL ALJ, who concluded that "Mr. Gunderson's raising safety concerns played no part in BNSF's decision to terminate." Fifth, the decision to discharge was made by General Manager Ebel after consulting with his supervisors and with BNSF human relations officers, not by Babik and Beam, the lower-level supervisors Gunderson accuses of safety-related bias.

The fact section of Gunderson's brief reprises his attacks on the merits of the discharge decision and asserts that BNSF's reasons for firing him "were pretextual, and thus retaliatory." We decline to review the merits of the discipline because "federal courts do not sit as a super-personnel department that re-examines an employer's disciplinary decisions." Kuduk, 768 F.3d at 792 (quotation omitted). The critical inquiry in a pretext analysis "is not whether the employee actually engaged in the conduct for which he was terminated, but whether the employer in good faith believed that the employee was guilty of the conduct justifying discharge." McCullough v. Univ. of Ark. for Med. Scis., 559 F.3d 855, 861-62 (8th Cir. 2009). Moreover, if the discipline was wholly unrelated to protected activity, as the ALJ found, whether it was fairly imposed is not relevant to the FRSA causal analysis. "An employee who engages in protected activity is not insulated from adverse action for violating workplace rules, and an employer's belief that the employee committed misconduct is a legitimate, non-discriminatory reason for adverse action." Richey v. City of Independence, 540 F.3d 779, 784 (8th Cir. 2008).

On appeal, Gunderson emphasizes evidence supporting the inference that Babik and Beam were hostile to Gunderson's safety complaints and injury reporting. Babik and Beam participated in the investigations and testified at the disciplinary hearings, he argues, where they served as "cat's paws" to Ebel, the ultimate decision-maker.[9] We agree with the district court that Gunderson failed to present "evidence that Beam or Babik influenced either of Ebel's [discharge] decisions." In this regard, we will limit our focus to the first investigation, Gunderson's harassment and intimidation of co-worker Duke. This matter was brought to BNSF's attention by a complaint from union president Campen. Babik's only role was to forward the complaint to his supervisor, consistent with BNSF policy requiring him to report a complaint of workplace harassment, and to arrange for witness interviews. There is no evidence that his motive in doing these routine tasks was to retaliate against Gunderson for remote-in-time FRSA-protected activities. Beam played no role in initiating the first investigation, did not testify at the first hearing, and was not involved in Ebel's decision to discharge Gunderson for the harassment. As the district court noted, Beam and Babik had only "trivial" participation in BNSF's preparation to prosecute the investigation hearings.

Gunderson further argues that BNSF's disparate treatment of Gunderson and Mace is evidence that Gunderson's protected activities contributed to his dismissal. We note that Mace, like Gunderson, was one of the "loud people in Willmar" engaged in safety advocacy and had submitted an injury report, so more lenient treatment of Mace, who engaged in similar protected activities, would undermine Gunderson's retaliation claim. See Bone v. G4S Youth Servs., LLC, 686 F.3d 948, 957 (8th Cir.

---

[9]The cat's paw theory requires proof that a supervisor "perform[ed] an act motivated by [discriminatory] animus that is *intended* by the supervisor to cause an adverse employment action . . . if that act is a proximate cause of the ultimate employment action." Kuduk, 768 F.3d at 790, quoting Staub v. Proctor Hosp., 131 S. Ct. 1186, 1194 (2011) (emphasis in original).

2012). More importantly, the first investigation confirmed that Gunderson and Mace were not similarly situated. BNSF officers opined that Mace's one short, cordial conversation with Cluka did not have the "same degree of severity" as Gunderson's harassment of Duke. Cluka testified that Mace asked him to withdraw his allegations against Peterson and never raised the subject again, whereas Gunderson's harassment of Duke was repeated and serious.

For these reasons, we conclude that summary judgment dismissing Gunderson's retaliation claim must be affirmed because he failed to submit evidence that would permit a reasonable jury to infer that his FRSA-protected activities were a contributing factor in BNSF's decision to discharge Gunderson for harassing and intimidating co-worker Duke. Therefore, we need not consider the district court's alternative ground, that BNSF proved by clear and convincing evidence it would have dismissed Gunderson regardless of his protected activity. Cf. Koziara v. BNSF Ry., 840 F.3d 873, 878-79 (7th Cir. 2016).

## IV. The Waiver Issue.

In defending the district court's summary judgment decision, BNSF urges us to rule, contrary to the district court, that Gunderson waived his right to file a *de novo* action in district court by engaging in protracted administrative adjudication of the

merits of his FRSA retaliation claim.[10]  In addressing this issue, we begin like the district court with the statute's text:

> [I]f the Secretary of Labor has not issued a final decision within 210 days after the filing of the complaint [with DOL] and if the delay is not due to the bad faith of the employee, the employee may bring an original action at law or equity for de novo review in the appropriate district court . . . which shall have jurisdiction over such an action . . . .

49 U.S.C. § 20109(d)(3).  Use of the present perfect tense -- if the Secretary "*has not issued* a final decision" -- indicates that, after 210 days, the complainant may abandon agency proceedings and resort to federal district court, so long as the 210-day delay is not due to his bad faith.  But if the claimant's administrative complaint proceeds to a final order, only the courts of appeals have jurisdiction to review the final agency action.  See § 20109(d)(4); 29 C.F.R. § 1982.112(a), (b).

The statute is silent on the question BNSF raises -- whether a claimant's conduct *after* his right to file a "kick-out" lawsuit has vested can waive his right to commence an action in district court.  BNSF argues that it can: "Just as litigating in court waives the right to arbitrate, and litigating in state court waives the right to remove to federal court, and litigating in one district waives the right to transfer to another, an FRSA plaintiff's active and substantial litigation before OSHA, the ALJ, and/or the ARB past the 210-day mark waives the right to invoke FRSA's 'kick-out'

_____

[10]Gunderson argues we cannot consider BNSF's waiver argument because BNSF has not cross-appealed the district court's final order.  This contention is without merit.  "We may affirm a judgment on any ground raised in the district court, and the party that prevailed in the district court need not file a cross-appeal to raise alternative grounds for affirmance."  Transcon. Ins. Co. v. W.G. Samuels Co., 370 F.3d 755, 758 (8th Cir. 2004); see Hudson Specialty Ins. Co. v. Brash Tygr, LLC, 769 F.3d 586, 593 (8th Cir. 2014).

option." BNSF cites no prior case in which an FRSA plaintiff's kick-out lawsuit has been dismissed on the pleadings because the plaintiff's prior litigation before the agency waived his statutory right to file a judicial *de novo* action before the DOL issued a final agency order.

In other contexts, a party's wasteful pursuit of two duplicative remedies will be deemed a waiver of one or the other. See, e.g., PR Group, LLC v. Windmill Int'l, Ltd., 792 F.3d 1025, 1026 (8th Cir. 2015) (removal to federal court); Erdman Co. v. Phoenix Land & Acquisition, LLC, 650 F.3d 1115, 1117 (8th Cir. 2011) (right to compel arbitration). However, the federal statutes underlying those decisions created or permitted alternative, not sequential remedies. Here, the statute expressly authorizes, indeed mandates pursuit of an administrative remedy before allowing pursuit of a sequential *de novo* judicial remedy that will necessarily be duplicative to some extent. So the question becomes, when does the employee's extended pursuit of an administrative remedy that must be exhausted for at least 210 days reflect his intentional abandonment of the § 20109(d)(3) judicial remedy? BNSF fails to suggest a specific answer to this question, simply arguing that "such duplicative litigation wastes scarce resources," as Congress surely knew in drafting the statute.

In opposing BNSF's waiver contention, Gunderson argues that § 20109(d)(3) by its express terms gives the employee-complainant an absolute right to file a kick-out *de novo* action if more than 210 days have elapsed since the administrative complaint was filed, the delay is not attributable to the employee's bad faith, and the Secretary has not issued a final order reviewable by a court of appeals. We disagree. In the first place, the Supreme Court has, "in the context of a broad array of constitutional and statutory provisions, articulated a general rule that presumes the availability of waiver." New York v. Hill, 528 U.S. 110, 114 (2000) (quotation omitted). Gunderson fails to articulate why that principle would not apply to this statute. Second, because no federal statute of limitations expressly applies to

§ 20109(d)(3) actions,[11] and because equitable relief such as reinstatement is authorized, it is likely that common law principles of laches may apply to cut off an employee's right to sue, or at least to seek equitable relief, some time after the § 20109(d)(3) action accrues.  See Brown-Mitchell v. Kansas City Power & Light Co., 267 F.3d 825, 827 (8th Cir. 2001) (Title VII post-charge delay); see generally Petrella v. Metro-Goldwyn-Mayer, Inc., 134 S. Ct. 1962 (2014); Astoria Fed. Sav. and Loan Ass'n v. Solimino, 501 U.S. 104, 108 (1991) ("[W]here a common-law principle is well established . . . courts may take it as given that Congress has legislated with an expectation that the principle will apply except when a statutory purpose to the contrary is evident."); Teamsters & Emp'rs Welfare Tr. of Ill. v. Gorman Bros. Ready Mix, 283 F.3d 877, 880-82 (7th Cir. 2002).

For laches to apply, defendant must prove:  "(1) the plaintiff unreasonably and inexcusably delayed filing the lawsuit, and (2) prejudice to the defendant from the delay."  Brown-Mitchell, 267 F.3d at 827.  As BNSF did not sufficiently develop its alternative waiver argument, did not raise a laches or estoppel defense in the district court or on appeal, and presented insufficient proof (if any) on these fact intensive issues, we leave these questions for another day.

The judgment of the district court is affirmed.

COLLOTON, Circuit Judge, concurring in part and concurring in the judgment.

I concur in Part I through III of the opinion of court, but do not join Part IV. The discussion of the common law principles of laches in Part IV is pure *dicta*, on an issue raised *sua sponte* by my colleagues.  Where the question is unnecessary to a

---

[11]At least one circuit has held that the "catchall" four-year statute of limitations in 28 U.S.C. § 1658(a) applies to a similar whistleblower statute.  Jones v. Southpeak Interactive Corp., 777 F.3d 658, 666 (4th Cir. 2015).

decision, and without briefing or argument on the complex issues lurking therein, including what statute of limitations might apply to an action under 49 U.S.C. § 20109(d)(3) and the implication of a limitations period for the availability of a laches defense, *see Petrella v. Metro-Goldwyn-Mayer, Inc.*, 134 S. Ct. 1962, 1973-74 (2014), I express no view on whether the defense is "likely" to cut off an employee's right to sue or to seek equitable relief. Nor is it necessary, given the conclusion in Part III, to address the company's contention that Gunderson, by his conduct, waived his right to file a *de novo* action in the district court. In particular, I do not join the court's apparent assumption that "Congress surely knew in drafting the statute" that railroad employees could undertake the sort of wasteful duplicative litigation displayed in this case, where a claimant pursued administrative remedies for nearly four years after expiration of the 210-day statutory period, received an unfavorable decision from an administrative law judge, and then started over with a duplicative *de novo* action in federal court.

_____