# United States Court of Appeals

## For the Eighth Circuit

_____

No. 16-3093

_____

BNSF Railway Company

*Petitioner*

v.

United States Department of Labor Administrative Review Board

*Respondent*

_____

Petition for Review of an Order of the
Administrative Review Board

_____

Submitted: April 7, 2017
Filed: August 14, 2017

_____

Before WOLLMAN and LOKEN, Circuit Judges, and NELSON,[1] District Judge.

_____

LOKEN, Circuit Judge.

The Federal Rail Safety Act (FRSA) prohibits a rail carrier from retaliating against an employee for reporting "a work-related personal injury." 49 U.S.C. § 20109(a)(4). On August 30, 2007, Clyde Carter, Jr. injured his shoulder and neck

_____

[1]The Honorable Susan Richard Nelson, United States District Judge for the District of Minnesota, sitting by designation.

while working as a carman at BNSF Railway Company's yard in Kansas City, Kansas. Carter immediately reported the injury to BNSF. The following year, he filed a Federal Employers' Liability Act (FELA) damage action, alleging that BNSF's negligence caused his injury. BNSF's discovery in defending the FELA lawsuit included a July 2009 deposition of Carter. In January 2012, as trial approached, BNSF Manager Bryan Thompson reviewed discovery materials provided by BNSF's attorneys. He discovered discrepancies between Carter's deposition testimony and information provided on his employment application and medical questionnaire submitted to BNSF in 2005. Thompson initiated a disciplinary investigation into potentially dishonest statements. Later, BNSF opened a second disciplinary investigation to determine if Carter signed a false statement that he arrived at work on time on February 5, 2012.

The investigations culminated in two "on-property" evidentiary hearings before BNSF General Foreman Charles Sherrill. Carter was represented by two union representatives. After the hearings, hearing officer Sherrill found that Carter committed both dishonesty violations and recommended discipline in accordance with BNSF's Policy for Employee Performance Accountability (PEPA). Phillip McNaul, field superintendent of Kansas operations, submitted the hearing records and Sherrill's findings to Joseph Heenan, a Director of Labor Relations in Texas, whose responsibilities included ensuring company-wide disciplinary consistency. Heenan reviewed the record, concluded there was substantial evidence supporting Sherrill's findings, and recommended that Carter be terminated for dishonesty, a "stand alone" violation that may result in dismissal without regard to the employee's prior disciplinary history. Senior management approved Heenan's recommendation. BNSF terminated Carter in two letters dated April 5 and April 16, 2012.

Following termination, Carter filed an FRSA complaint with the Department of Labor, alleging that BNSF initiated the investigations leading to his dismissal in retaliation for Carter reporting the August 2007 work-related injury. The

Occupational Safety and Health Administration initially reviews FRSA retaliation complaints. See 29 C.F.R. § 1982.104. OSHA dismissed Carter's complaint, finding he committed the violations, and BNSF proved by clear and convincing evidence that "other employees who had not engaged in protected activity have been dismissed from service for dishonesty." Carter filed objections. See 29 C.F.R. § 1982.106. After an evidentiary hearing, an Administrative Law Judge (ALJ) found that BNSF violated 49 U.S.C. § 20109(a)(4) and awarded reinstatement, back pay, attorneys' fees, and $50,000 punitive damages. BNSF filed an administrative appeal. The Secretary's Administrative Review Board (ARB) affirmed the ALJ.

BNSF petitions for review of the ARB's order, which is the final agency action. See 49 U.S.C. § 20109(d)(4); 29 C.F.R. § 1982.110(d). Our review of FRSA retaliation orders conforms to Administrative Procedure Act standards. See 49 U.S.C. § 20109(d)(4). We set aside agency action that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accord with law." 5 U.S.C. § 706(2)(A); see GoJet Airlines, LLC v. FAA, 743 F.3d 1168, 1170 (8th Cir. 2014). We review the agency's legal conclusions *de novo*, giving deference to its "reasonable interpretation" of the statute. Pattison Sand Co. v. Fed. Mine Safety & Health Review Comm'n, 688 F.3d 507, 512 (8th Cir. 2012). We review factual findings for substantial evidence on the record as a whole, considering evidence that both supports and detracts from the ALJ's decision. Mercier v. U.S. Dep't of Labor, 850 F.3d 382, 388 (8th Cir. 2017). Here, we conclude the ARB's order may not be upheld because the ALJ erred in interpreting and applying the FRSA and failed to make findings of fact that are critical to a decision applying the proper legal standard. Accordingly, we reverse the ARB's order and remand.

To prevail on his FRSA complaint, Carter must "prove, by a preponderance of the evidence, that '(i) he engaged in a protected activity; (ii) BNSF knew or suspected, actually or constructively, that he engaged in the protected activity; (iii) he suffered an adverse action; and (iv) the circumstances raise an inference that the

protected activity was a contributing factor in the adverse action.'" Gunderson v. BNSF Ry., 850 F.3d 962, 968 (8th Cir. 2017), quoting Kuduk v. BNSF Ry., 768 F.3d 786, 789 (8th Cir. 2014). If he meets that burden, BNSF may avoid liability if it "demonstrates, by clear and convincing evidence, that [it] would have taken the same unfavorable personnel action in the absence of [Carter's protected activity]." 49 U.S.C. § 42121(b)(2)(B)(ii). BNSF conceded the first three elements of Carter's affirmative case -- that his prompt injury report was protected activity; BNSF had direct knowledge of this report; and Carter suffered adverse action when BNSF fired him. This left two issues for adjudication: whether Carter could prove the circumstances raised an inference that the injury report was a contributing factor in his termination, and if so, whether BNSF could prove that it would have fired Carter regardless of his protected activity. "A 'contributing factor' includes any factor which, alone or in connection with other factors, tends to affect in any way the outcome of the [adverse] decision." Gunderson, 850 F.3d at 969 (quotation omitted).

An unusual aspect of this case is that Carter's protected injury report was made and known by his BNSF supervisors in August 2007, more than *four years* prior to the adverse action of BNSF investigating and terminating Carter for acts of dishonesty in 2005 and 2012 that were seemingly *unrelated* to his 2007 injury and injury report. In a retaliation case, "[a] gap in time between the protected activity and the adverse employment action weakens an inference of retaliatory motive." Wells v. SCI Mgmt., L.P., 469 F.3d 697, 702 (8th Cir. 2006) (quotation omitted); see Clark Cty. Sch. Dist. v. Breeden, 532 U.S. 268, 274 (2001) (per curiam) ("Action taken (as here) 20 months later suggests, by itself, no causality at all."); Gunderson, 850 F.3d at 969.

The ALJ nonetheless found that the injury report was a contributing factor by applying a "chain of events" theory of causation. The ALJ reasoned:

-4-

In establishing that a protected activity was a contributing factor . . . it is not necessary to show that the employer was motivated by the activity or even give any significance to the activity. . . . [A]ll a complainant need do is show that the employer knew about the protected activity and the protected activity was a necessary link in a chain of events leading to the adverse activity.

* * * * *

Mr. Carter's workplace injury, and its report to his supervisors, set off a chain of events that led to his successful FELA suit against [BNSF], which encompassed Mr. Carter's deposition as part of discovery. . . . [I]t was during the discovery phase in the FELA lawsuit that the medical and other records used as a justification for firing Mr. Carter were discovered. . . . [T]emporal distance between the protected activity and the adverse action does not automatically 'negate' the contribution of the protected activity to the adverse action.

* * * * *

In this case, it is not possible to isolate Mr. Carter's 'report' of his 2007 workplace injury from the injury itself. . . . Indeed, the basis for discussing Mr. Carter's termination cannot be explained without also discussing his 'report' of his injury. There is nothing even close to a complete break in the chain of events, such that Mr. Carter's 'report' of his injury dropped out of the line of causation leading to his termination.

The ALJ's chain-of-events theory of causation is contrary to judicial precedent construing the causation element of an FRSA retaliation claim. As the Seventh Circuit explained in Koziara v. BNSF Ry., to hold that protected activity is a "contributing factor" to an adverse action simply because it ultimately led to the employer's discovery of misconduct "is a further example of confusing a cause with a proximate cause. The plaintiff's having been born was an initiating event without which he would not exist, but obviously an event devoid of legal significance." 840

-5-

F.3d 873, 878 (7th Cir. 2016), cert. denied, 137 S. Ct. 1449 (2017).[2]  Of equal importance, the ALJ's ruling that BNSF's motive was irrelevant to the contributing factor inquiry is contrary to this court's controlling decisions:

> As the [Supreme] Court explained in Staub, the essence of this intentional tort is "discriminatory animus." . . . [T]he contributing factor that an employee must prove is intentional retaliation prompted by the employee engaging in protected activity.

Kuduk, 768 F.3d at 791, followed in Gunderson, 850 F.3d at 969.  Absent sufficient evidence of intentional retaliation, a showing that protected activity initiated a series of events leading to an adverse action does not satisfy the FRSA's contributing factor causation standard.

The ARB properly declined to endorse the ALJ's chain-of-events causation theory, characterizing her contributing factor findings as "difficult to follow."  The ARB nonetheless affirmed because the ALJ "provided sufficient reasons . . . independent of this justification to support a finding of contributory causation" and to reject BNSF's affirmative defense.  The ARB affirmed the ALJ's decision based on the following "findings": (1) "evidence of a change in Carter's supervisors' attitude toward him after he filed his initial injury report," (2) BNSF's justifications for both investigations of Carter were "unworthy of credence," and (3) "circumstantial evidence support[ed] an inference of retaliatory motive on [BNSF's] part."  If sound, we uphold the agency's reliance on a factually supported alternative

_____

[2]Though "contributing factor" is a lenient causation standard, an FRSA plaintiff must still prove that his injury report "not only was a 'but for' cause of his injury, but was the proximate cause as well."  Hemi Group, LLC v. City of New York, N.Y., 559 U.S. 1, 9 (2010) (quotation omitted); see Staub v. Proctor Hosp., 562 U.S. 411, 419 (2011) (proximate cause excludes "those links that are too remote, purely contingent, or indirect," quoting Hemi Group).

ground.  But here, we conclude that these "findings" are either non-existent or insufficient to support the ARB's contributing factor and affirmative defense rulings.

(1) Carter testified that his supervisors "targeted" him after the injury and injury report.  One of Carter's former supervisors, Larry Lee Mills, testified that he witnessed BNSF target Carter for discipline and overheard Sherrill say he had to "nail Carter" following Carter's report of his injury.  That is certainly relevant to the issue of discriminatory animus.  But Sherrill denied ever saying he was going to "nail" Carter and testified that he based his decision as hearing officer solely on his findings of Carter's dishonesty, not on his prior protected activity.  Superintendent McNaul testified that he never authored a document telling supervisors to watch employees who suffered an injury and write them up, as Mills testified.  The ALJ made no explicit finding on the targeting issue.  Indeed, she made no credibility finding as to Mills's testimony and found that Carter's testimony was "contradictory or inconsistent" at times but credible "on crucial points," namely, in describing his employment application process and his failure to clock in on February 5, 2012.  If credited, Carter's and Mills's testimony could support an ultimate finding of intentional retaliation.  But the ALJ made no finding of discriminatory animus by any BNSF supervisor, and her chain-of-events causation theory allowed her to avoid highly relevant questions -- was any animus in the workplace the result of Carter's injury or his filing a contested FELA lawsuit, rather than his injury report, and how did that animus contribute to disciplinary investigations commenced many years later?  The ARB simply ignored these issues, instead adopting the ALJ's arbitrary and capricious assertion "that it is pure semantics to separate the 'report of injury' from the injury itself."  If there was co-worker animus based solely on Carter filing an FELA lawsuit accusing BNSF and its employees of negligence it vigorously denied, that would not violate 49 U.S.C. § 20109(a)(4).

(2) The ALJ's conclusory assertions that BNSF's justifications for terminating Carter were "unworthy of credence" are not supported by substantial evidence.  Of

course, as the ALJ noted, intentional discrimination may be inferred "from the falsity of the employer's explanation." Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 147 (2000). The ALJ found that the first termination was unworthy of credence because BNSF failed to grant a request by Carter's union representatives for a continuance based upon BNSF's delay in providing documents pertaining to his 2005 employment application. But the ALJ in an FRSA retaliation proceeding has no authority to punish BNSF for conducting disciplinary proceedings in accordance with the governing collective bargaining agreement and Railway Labor Act procedures that the ALJ considers unfair. "The critical inquiry in a pretext analysis is . . . whether the employer in good faith believed that the employee was guilty of the conduct justifying discharge. Moreover, if the discipline was wholly unrelated to protected activity . . . whether it was fairly imposed is not relevant to the FRSA causal analysis." Gunderson, 850 F.3d at 969 (citation and quotation omitted). Here, the ALJ and the ARB did not undertake the "critical inquiry" and make the findings needed to resolve it.

Regarding the second investigation into whether Carter was dishonest in describing his late arrival to work on February 5, 2012, the ALJ found it "conceivable that, considered in isolation, this incident could establish that [BNSF] would have fired Mr. Carter even absent his injury." However, because this second termination followed the first investigation into Carter's dishonesty, the ALJ found that it could not be "cleanly excised from the surrounding circumstances," and therefore BNSF's justification was "unworthy of credence." This "finding" was not a legitimate pretext analysis; it was an extension of the ALJ's flawed chain-of-events causation theory. The ARB credited the ALJ's conclusion that firing Carter "not once, but twice," was evidence of retaliation for protected activity. We disagree, as there was no finding that *either* disciplinary decision was the product of intentional retaliation for Carter submitting an injury report four years earlier. See Gunderson, 850 F.3d at 966 (involving two hearings held on consecutive days to consider distinct disciplinary violations).

(3) The ARB's conclusion that other circumstantial evidence supported an inference of retaliatory motive was based on its determination that Carter's FELA litigation was itself FRSA-protected. Citing LeDure v. BNSF Ry., ARB No. 13-044, 2015 WL 4071574 (Admin. Rev. Bd. June 2, 2015), the ARB concluded that, "[w]hile apparently not alleged as protected activity in its own right, the FELA litigation undisputedly involved the 2007 injury and kept Carter's protected report of injury fresh as the events in the case unfolded." Therefore, the ARB held it was protected.

As the concurring ARB member noted, LeDure held only that the FRSA protects a notice of injury made in the course of FELA litigation, not that FELA litigation is *per se* protected by the FRSA. By misstating the scope of its decision in LeDure, the ARB decided without discussion a significant issue that Carter failed even to allege and that has never been considered by this court or by our sister circuits. This was "such failure to explain administrative action as to frustrate effective judicial review." Camp v. Pitts, 411 U.S. 138, 142 (1973). The ALJ found that Thompson, who initiated the first investigation in January 2012, knew of Carter's injury "on the date it occurred or very soon thereafter," so it is clear the FELA litigation did not notify Thompson of Carter's injury. To base its decision on LeDure, the ARB needed a finding that Carter's FELA lawsuit provided BNSF with "more specific notification" of his injury report, a fact question relevant to the temporal proximity between the protected activity and Carter's termination.

The ARB was unable to salvage an ALJ analysis built upon a flawed theory of causation because the ARB lacked critical fact findings needed to affirm the ALJ's decision when applying the appropriate legal standard. To the extent the ARB filled in the missing findings, it exceeded its scope of review. See Stone & Webster Constr. v. U.S. Dep't of Labor, 684 F.3d 1127, 1133 (11th Cir. 2012), construing 29 C.F.R. § 1982.110(b). Accordingly, we must remand. See Florida Power & Light Co. v. Lorion, 470 U.S. 729, 744 (1985); GoJet Airlines, 743 F.3d at 1172. We need only briefly address BNSF's additional contentions on appeal.

-9-

First, in rejecting BNSF's contention that it proved it would have fired Carter even in the absence of his FRSA-protected activity, the ARB summarily affirmed the ALJ, who ruled: "It is virtually impossible for [BNSF] to establish that it would have fired Mr. Carter for dishonesty on his employment application absent his workplace injury and its report, for the simple reason that, had Mr. Carter not suffered this injury, which ultimately led to a lawsuit under the FELA, [BNSF] would not have learned about the injuries and military history that were the basis for its dismissal of Mr. Carter." This reasoning is nothing more than the ALJ's flawed chain-of-events causation theory and should be disregarded on remand.

Second, BNSF argues the ARB erred in affirming the ALJ's award of punitive damages. Plaintiffs seeking punitive damages have a "formidable burden." Sturgill v. United Parcel Serv., Inc., 512 F.3d 1024, 1035 (8th Cir. 2008) (applying malice or reckless indifference standard in Kolstad v. Am. Dental Ass'n, 527 U.S. 526, 536 (1999), cited by the ARB in this case). Even if Carter can show unlawful retaliation, BNSF "may avoid vicarious punitive damages liability by showing that it made good faith efforts to comply with [the FRSA]." Id. Here, the ALJ acknowledged that BNSF "has a Code of Conduct that specifically prohibits retaliation, an Injury Reporting Policy prohibiting retaliation against employees who report injuries, a Mechanical Safety Rule expressly prohibiting retaliation, a hotline or website, and review of dismissals by its Labor Relations Department," and that Heenan, "the person ultimately responsible for reviewing the file and making a recommendation, had never met Mr. Carter, and knew nothing about his injury or subsequent lawsuit." This is strong evidence of BNSF's good-faith efforts to prevent retaliation. See Bennett v. Riceland Foods, Inc., 721 F.3d 546, 553 (8th Cir. 2013). As summarized by the ARB, the ALJ awarded punitive damages because BNSF fired Carter "not once, but twice," and did not provide Carter with fair discovery and a continuance at his first on-property hearing. On this record, we would reverse the award of punitive damages.

-10-

Third, we remand without considering BNSF's contention that the ARB should not have ordered Carter reinstated to his prior position because of "animosity between the parties and the likelihood that they could not work together in peace." McIntosh v. Jones Truck Lines, Inc., 767 F.2d 433, 435 (8th Cir. 1985); compare 42 U.S.C. § 2000e-5(g), the governing statute in McIntosh, with 49 U.S.C. § 20109(e)(2)(A) (relief afforded the employee "*shall* include . . . reinstatement").

We grant BNSF's petition for review, vacate the ARB's order, and remand for further proceedings not inconsistent with this opinion.

_____