# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 09-1674

_____

Dianna L. Helton,

       Appellant,

v.

Southland Racing Corporation,

       Appellee.

\*
\*
\*
\*  Appeal from the United States
\*  District Court for the Eastern
\*  District of Arkansas.
\*
\*  [PUBLISHED]
\*

_____

Submitted: December 15, 2009
Filed:  April 5, 2010

_____

Before LOKEN, Chief Judge[1], ARNOLD, and BENTON, Circuit Judges.

_____

PER CURIAM.

Dianna L. Helton sued her former employer, Southland Racing Corporation, for employment discrimination and retaliation under Title VII of the Civil Rights Act of 1964, _see_ 42 U.S.C. §§ 2000e-2(a), 2000e-3(a), and the Arkansas Civil Rights Act

---

[1]The Honorable James B. Loken stepped down as Chief Judge of the United States Court of Appeals for the Eighth Circuit at the close of business on March 31, 2010.  He has been succeeded by the Honorable William Jay Riley.

(ACRA), *see* Ark. Code Ann. §§ 16-123-107, 16-123-108. The district court[2] granted summary judgment to Southland. Ms. Helton appeals. This court affirms.

## I.

Ms. Helton, who is white, claimed that Southland subjected her to a hostile work environment and constructively discharged her because of her race and retaliated against her. On this summary-judgment appeal, this court views the evidence and all inferences from it favorably to Ms. Helton. *Anda v. Wickes Furniture Co.*, 517 F.3d 526, 531 (8th Cir. 2008).

Southland began as a dog-racing track, later started offering simulcast dog and horse racing, and added gaming (such as video poker) shortly before it hired Ms. Helton as a money room clerk. Southland promoted her to an assistant cage manager seven months later at the same time that it hired a second assistant cage manager, Barbara Van Laan, who is also white. Soon thereafter, Southland added a third and final assistant cage manager, Darlene Dumas, an African-American. Up to 30 Southland employees worked in the cage, which acts as a bank where customers purchase and cash-in their gambling chips. The cage manager supervised the assistants, and the controller, in turn, supervised the cage manager.

Southland hired Melissa Partee as the controller approximately a year after it hired Ms. Helton. When the cage manager resigned, Ms. Partee appointed Ms. Helton as acting cage manager. About once a week, Ms. Partee sent her a demeaning or condescending email; the emails usually criticized her work and intimated that she was incompetent. When Ms. Helton became acting cage manager, Mike Corbin, a vice president at Delaware North Companies (Southland's parent company) and

_____

[2]The Honorable James M. Moody, United States District Judge for the Eastern District of Arkansas.

Ms. Partee's supervisor, told Ms. Helton that she should contact him directly any time there was a problem in the cage. She called him shortly afterward to tell him that Ms. Partee was critical of everything that she and the other employees were doing and was micro-managing the cage. He said that he would be coming to Southland shortly and would talk to Ms. Partee; he assured Ms. Helton that he would tell Ms. Partee nothing about their conversation. After Mr. Corbin's visit, Ms. Partee's behavior improved for a while. But Ms. Helton believed that Ms. Partee had somehow learned about her telephone conversation with Mr. Corbin, because Ms. Partee resumed speaking to her in a demeaning way a couple of weeks later.

Ms. Helton applied for the permanent cage manager position when it was posted but Southland hired Shondail Beech, who was white. Ms. Beech had worked in gaming for 15 years and Ms. Helton did not have gaming experience. After Ms. Beech was hired, Southland's general manager assured Ms. Helton that she had been "close" to being hired for the job and that he would ask Ms. Beech to "take [Ms. Helton] under her wing" to train her for that position when it was next available. Ms. Helton believed that Ms. Partee had tried unsuccessfully to place an African-American in the position and had contacted upper management to prevent Ms. Helton from becoming the cage manager in retaliation for her speaking with Mr. Corbin.

Shortly after Ms. Beech became the cage manager, Ms. Partee called a meeting with her and the assistant cage managers. During the meeting, Ms. Helton asked to have some day shifts, explaining that the previous cage manager had promised her the shifts before she resigned. Ms. Partee refused, announcing that all three assistants would keep the shifts that they were hired to perform. Because the new general manager had directed employees to follow the chain of command when a problem arose, Ms. Helton went to see Ms. Beech after the meeting. She told Ms. Beech that Ms. Partee "hate[d] white people" and that she was discriminating by allowing Ms. Dumas to keep the day shifts. Ms. Beech, who set the schedule, responded that she would "work on it" now that she knew that Ms. Helton had been promised the

shifts. When Ms. Helton left the meeting, Ms. Partee was standing right outside the door and was listening to the conversation. Two weeks later, Ms. Helton got the shifts that she had requested.

Ms. Helton had no further difficulties with Ms. Partee until one of the cashiers whom Ms. Helton supervised came up $500 short at the end of her shift. Because Southland dealt in large sums of money, it carefully monitored any discrepancy. If missing funds could not be accounted for, the employee in charge of the cash drawer had to reimburse Southland. Even small discrepancies, which were not unusual, were investigated; a $500 loss was rare. On the day that the shortage occurred, a security guard had asked Ms. Helton to get a package of gum for him from the cashier's drawer while the cashier was gone. As cashiers were prohibited from having gum in their cubicles, Ms. Helton angrily removed the package of gum from the cash drawer and gave it to the guard. When she reported the missing funds to Ms. Beech and Ms. Partee, Ms. Helton also told them about having removed the gum. Ms. Helton was questioned, but a videotape from one of Southland's many surveillance cameras made it plain that Ms. Helton had done nothing wrong. The cashier, who was African-American, was eventually terminated.

Ms. Partee met with Ms. Helton after she was exonerated. Ms. Helton described the meeting as a good one, but she thought that it was unfair for Ms. Partee to tell her that she would be written up if she went into one of the cashier's drawers again. Ms. Helton believed that she was permitted to do so as an assistant cage manager. Ms. Partee also cautioned her that she should be more careful next time "because it could have been a setup."

Ms. Helton came to work a few days later with no thought of quitting her job. She expected to be at Southland in the future and enjoyed her work. Around noon, she received a call from her sister, who also worked at Southland. Her sister said that she had heard from a co-worker, who had heard from another employee, that there had

been a meeting the night before during which Ms. Partee "was trying to implicate [Ms. Helton] in theft" of the $500, even though she was aware that Ms. Helton had been exonerated. She called her husband and talked about what had happened. About two hours after her sister called, Ms. Helton submitted a letter of resignation that said that she had enjoyed working for Southland. She testified that she was aware of what people could do if they wanted to set someone up for a crime. Though she was not concerned about the incident involving the missing money because of the videotape, she knew that Ms. Partee had tools at her disposal, such as computerized records, to use to set her up in the future. After Ms. Helton left, Ms. Partee told another employee that because Ms. Helton had resigned, she must have taken the money.

## II.

We first address Ms. Helton's claim that Ms. Partee, subjected her to a hostile work environment because she was white. "When the workplace is permeated with discriminatory intimidation, ridicule, and insult, that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment, Title VII is violated." *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993). To make out a claim based on a hostile work environment, a plaintiff must present evidence of a working environment "that a reasonable person would find hostile or abusive, and one that the victim in fact did perceive to be so." *Faragher v. City of Boca Raton*, 524 U.S. 775, 787 (1998).

To determine whether racial harassment or discrimination is sufficiently severe or pervasive to be actionable, we must consider all of the circumstances, including the frequency and severity of the discriminatory conduct; " 'whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance.' " *Woodland v. Joseph T. Ryerson & Son, Inc.*, 302 F.3d 839, 843 (8th Cir. 2002) (quoting *Harris*, 510 U.S. at 21-23).

While Southland asserts that the record will not support a finding that Ms. Partee's remarks to Ms. Helton were racially based, this court need not reach that issue here because, regardless of Ms. Partee's motivation, we conclude that the harassment that Ms. Helton suffered was not severe or pervasive enough to affect a term, condition, or privilege of her employment. *See Elnashar v. Speedway SuperAmerica, LLC*, 484 F.3d 1046, 1058 (8th Cir. 2007).

The alleged verbal harassment in this case was neither frequent nor severe. Ms. Helton said that Ms. Partee sent her demeaning or condescending emails about once a week during the two months that Ms. Helton was acting cage manager; Ms. Partee primarily communicated by email. Ms. Partee sent fewer emails after Ms. Beech was hired and she was no longer Ms. Helton's immediate supervisor. Ms. Helton remembered little of the emails' content and what she did remember was not particularly remarkable: Ms. Helton objected to Ms. Partee copying the assistant cage managers on an email that she sent to Ms. Helton reprimanding her for failing to send Ms. Partee information about the assistant managers. Ms. Helton vaguely remembered another email that had offended her; although she did not remember the topic, she recalled that Ms. Partee criticized her for something that Ms. Helton considered "petty."

Ms. Helton had two or three conversations with Ms. Partee each week, and Ms. Helton testified that "[m]ost of those were fine," although "there were a couple of times she got out of line yelling and screaming at me." On one occasion, Ms. Partee called Ms. Helton to her office, spoke calmly about everyday work matters, and then suddenly began shouting and accusing Ms. Helton of telling people that Ms. Partee had caused one or two members of the four-person drop-team to take medical leave. (The drop team was responsible for removing the gaming machines' "drop cans," which held large sums of money; the loss of drop-team members could cause a crisis because Southland had to conduct lengthy background checks before hiring replacements.) Ms. Helton denied the accusation, suggesting that Ms. Partee herself

had told people since she had previously told Ms. Helton how she caused a member of the drop-team to cry (and laughed while telling her the story). When counsel asked if there were other incidents, Ms. Helton described Ms. Partee's remark at a managers' meeting during an exercise where they were naming animals that they identified with. After Ms. Helton's turn, the general manager commented that he saw Ms. Helton as a tiger and Ms. Partee described her as a peacock. Ms. Helton took offense, believing Ms. Partee meant that she was "showy." She could not recall any other specific written or oral statements by Ms. Partee that were hostile or condescending, though she remembered Ms. Partee saying that several white employees' heads were "on the chopping board."

Ms. Helton admitted that she was never physically threatened, that her job was never threatened, and that she was never written up or disciplined as part of the alleged harassment. She complains that she was not hired as a cage manager, but hiring another white person with significantly more experience cannot support a claim that Ms. Helton was subjected to a hostile environment because she is white. Likewise, Ms. Partee's denial of Ms. Helton's request for day shifts, which Ms. Beech almost immediately reversed, is not a circumstance that is actionable. Although Ms. Partee's conduct might well have been rude and demeaning at times, Title VII does not "create a federal remedy for all offensive language and conduct in the workplace." *Joens v. John Morrell & Co.*, 354 F.3d 938, 941 (8th Cir. 2004). In sum, the evidence does not show that Ms. Helton's workplace was "permeated with discriminatory intimidation, ridicule, and insult, that is sufficiently severe or pervasive to alter" her conditions of employment, and thus Ms. Helton did not make out a hostile environment claim. *Harris*, 510 U.S. at 21.

### III.

Ms. Helton also failed to offer sufficient evidence that she was constructively discharged. As the Supreme Court explained in *Pennsylvania State Police v. Suders*,

542 U.S. 129, 147 (2004), a "hostile-environment constructive discharge claim entails something more" than is necessary for a claim of a hostile working environment: The plaintiff "must show working conditions so intolerable that a reasonable person would have felt compelled to resign." *Id.*

As noted, Ms. Helton's evidence failed to show that she was subjected to a hostile environment, and so it necessarily follows that she cannot show "something more." She simply did not demonstrate that her working conditions were objectively intolerable. Apparently she did not think that her job was intolerable two hours before she resigned: She testified that she had no thought of quitting when she came to work that day and planned to have a future at Southland. But she "snapped" (her word) when her sister told her that she had heard that Ms. Partee had told others that Ms. Helton was a suspect in the missing funds matter. After hearing this, Ms. Helton took no steps to investigate whether it was true that Ms. Partee said that, and she did not fear being blamed for the lost funds when she quit. She testified that she resigned because she was afraid that Ms. Partee would damage her reputation by "setting her up" to be blamed for something in the future. She therefore was in no imminent danger that made staying intolerable. Thus, the evidence fails to support a finding that Ms. Helton's working environment would have compelled a reasonable person to quit her job.

IV.

To make out a *prima facie* retaliation case under Title VII, Ms. Helton had to show that she engaged in protected conduct by opposing a practice that a reasonable person could believe violated that title, *see* 42 U.S.C. § 2000e-3(a); *Barker v. Missouri Dep't of Corrs.*, 513 F.3d 831, 835 (8th Cir. 2008); that a materially adverse action was taken against her, *see Burlington Northern & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 60, 68 (2006); and, that there was a causal connection between the protected

conduct and the adverse action. *Betz v. Chertoff*, 578 F.3d 929, 937 (8th Cir. 2009) *cert. denied*, 2010 WL 390388 (U.S. Mar. 22, 2010).

In her brief to this court, Ms. Helton states as an issue that the facts establish a prima facie case for retaliation. She states that she engaged in the statutorily protected conduct of reporting Ms. Partee's racial discrimination to superiors, citing two instances.

First, she contends that Ms. Partee retaliated against her for the phone call that she made to Mr. Corbin. Because she acknowledged that she said nothing in that call about race discrimination, her conversation was not protected conduct under Title VII, and so any action taken in response to the conversation cannot be actionable under Title VII.

Second, Ms. Helton maintains that Ms. Partee retaliated against her because she told Ms. Beech that Ms. Partee hated white people and that Ms. Partee had discriminated against her by allowing Ms. Dumas, an African American with less seniority, to keep the day shifts that Ms. Helton had been promised. Ms. Helton's conversation with Ms. Beech was protected conduct (Ms. Partee, standing outside the door while they talked, heard the conversation).

As for the "materially adverse action" taken against her, Ms. Helton points to "a working environment that was so unbearable, appellant was forced to quit as a result of Partee's actions against her." (Appellant's Brief, p. 40.) Ms. Helton concludes, "Therefore, Appellant suffered material adverse employment action when she was constructively discharged." (*Id.*, p. 41.)

Ms. Helton's brief is clear that she claims that defendant retaliated against her only in the form of constructive discharge. She does not argue on appeal that any incident is a discrete, cognizable incident of unlawful retaliation, and this court will

not take up that argument sua sponte.[3]  *See Fischer v. Avanade, Inc.*, 519 F. 3d 393, 408 n.7 (7th Cir. 2008).  Because Ms. Helton claims only the materially adverse action of a constructive discharge, and because this court has held that she failed to offer sufficient evidence of a constructive discharge, she has not demonstrated a materially adverse action against her.  *See Brenneman v. Famous Dave's of Am., Inc.*, 507 F. 3d 1139, 1146 (8th Cir. 2007); *Betz*, 578 F.3d at 938.  Her retaliation claim fails.

## V.

Ms. Helton made the same claims under the ACRA and Title VII, but she cites only federal cases on appeal and does not argue that state law provides her any rights that she does not have under Title VII.  Moreover, the Arkansas Supreme Court looks to interpretations of Title VII as persuasive authority for interpreting the ACRA.  *See Island v. Buena Vista Resort*, 352 Ark. 548, 556-57, 103 S.W.3d 671, 675-76 (2003); *see also* Ark. Code § 16-123-105(c); *Crone v. United Parcel Service, Inc.*, 301 F.3d 942, 945 (8th Cir. 2002).  The district court's judgment rejecting the state law claims is also affirmed.

## VI.

The judgment of the district court is affirmed.

---

[3]Before the district court, Ms. Helton's retaliation claims were confusing.  For example, she admitted she "was not concerned about being implicated for Pace's cash shortage" but rather worried "about being set-up for termination at some down the road."  However, her complaint, response to the summary-judgment motion, and brief to the district court consistently cite her constructive discharge as the only materially adverse action against her.

-10-

ARNOLD, Circuit Judge, concurring in part and dissenting in part.

I concur in all of the court's opinion except Part IV, which concludes that Ms. Helton has not made out a retaliation claim. Because I believe that, fairly construed, her complaint and the record evidence do indeed support such a claim, I respectfully dissent.

Ms. Helton maintains that Ms. Partee retaliated against her because she told Ms. Beech that Ms. Partee hated white people and that Ms. Partee had discriminated against her by allowing Ms. Dumas, an African American with less seniority, to keep the day shifts that Ms. Helton had been promised. Ms. Helton's conversation with Ms. Beech was protected conduct and, as the court notes, Ms. Partee was standing right outside the door while they talked and she heard the conversation.

Southland argued in its summary judgment motion that Ms. Partee could not recover because she did not establish that she suffered a "materially adverse employment action," meaning an action that affected employment or altered workplace conditions. The district court agreed with Southland's view of the applicable legal standard and granted summary judgment based on it. *See Gilooly v. Missouri Dep't of Health & Senior Servs.*, 421 F.3d 734, 739 (8th Cir. 2005). But this was error under *Burlington Northern & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 60, 68 (2006), which held that a plaintiff in a Title VII retaliation claim need only show that he or she was subjected to an action that was materially adverse, "which in this context means it well might have dissuaded a reasonable worker from making or supporting a charge of discrimination." *Id.* (internal quotation marks and citations omitted); *Littleton v. Pilot Travel Ctrs., LLC* , 568 F.3d 641, 644 (8th Cir. 2009). I note that Ms. Helton quoted the relevant language from *Burlington* in her summary judgment response.

Though I agree that Ms. Helton did not show that she suffered an adverse employment action, I think that she presented sufficient evidence of a materially adverse action to survive summary judgment. In her complaint, Ms. Helton alleged that Ms. Partee retaliated for her statements to Ms. Beech by falsely accusing her of theft and she produced evidence of those accusations in her opposition to the motion for summary judgment. Although much of this evidence is hearsay, Ms. Helton provided an affidavit of a co-worker, Marcia Montgomery, that sets out testimony admissible at trial: Ms. Montgomery attested that after Ms. Helton resigned, Ms. Partee told her that Ms. Helton "must have taken the money from the cage or she would not have quit" and that "someone in surveillance had told her" (Ms. Partee) that Ms. Helton "took the money." Ms. Montgomery thus presents a first-hand account of what Ms. Partee said, which is admissible as a statement of a party opponent. Besides, the statement is not offered for its truth. Title VII prohibits post-employment retaliation, *Robinson v. Shell Oil Co.*, 519 U.S. 337, 346 (1997), and I think that Ms. Partee's false charge of theft "could well dissuade a reasonable worker" from making a discrimination charge because such an accusation is highly defamatory, *see Burlington*, 548 U.S. at 57.

Because I believe that the district court erroneously granted summary judgment on this element of Ms. Helton's *prima facie* case, I would reverse the judgment in favor of Southland on her retaliation claim based on Title VII.

I therefore respectfully dissent.

_____