# United States Court of Appeals

### For the Eighth Circuit

_____

No. 15-3508

_____

Shana D. Donathan

*Plaintiff - Appellant*

v.

Oakley Grain, Inc.; Bruce Oakley, Inc.; Dennis Oakley

*Defendants - Appellees*

_____

Appeal from United States District Court
for the Eastern District of Arkansas - Little Rock

_____

Submitted: September 22, 2016
Filed: June 28, 2017

_____

Before COLLOTON, MELLOY, and SHEPHERD, Circuit Judges.

_____

MELLOY, Circuit Judge.

Shana Donathan appeals the district court's adverse grant of summary judgment on her employment claim alleging retaliatory termination. Because a reasonable jury could conclude her protected action was the but-for cause of her termination, we reverse the judgment of the district court.

## I. Background

Defendant Oakley Grain, Inc., a wholly owned subsidiary of Defendant Bruce Oakley, Inc., operates grain facilities in Missouri and Arkansas. Defendant Dennis Oakley is president of both companies. Charlie Porter manages two of Oakley Grain's facilities, the Yellow Bend and Pendleton facilities.

Oakley Grain hired Donathan in August 2010 to work at the Yellow Bend facility in Arkansas City, Arkansas. Donathan's initial duties included various tasks, primarily answering phones and weighing and grading grain. Shortly after Donathan was hired, another employee quit and Donathan's duties expanded to include payroll functions. When needed, for example if Yellow Bend closed due to flooding or if Pendleton was short staffed, Donathan would report to the Pendleton facility. Throughout her employment, Donathan's work occurred primarily indoors in an office or at the indoor controls of remotely controlled grain-measuring equipment. Workers at Yellow Bend, however, were expected to serve multiple functions, and she occasionally worked outdoors around grain elevators or barges. In 2011, 2012, and 2013, Donathan received raises. Porter characterizes Donathan as a good employee with a good work ethic, and the record contains no evidence of poor reviews, prior discipline, or anticipated discipline.

Donathan learned that her brother, also an Oakley Grain employee, had received "harvest and safety bonuses" as an employee at the Pendleton facility. Donathan understood generally that other employees received such bonuses. On Thursday, January 23, 2014, Donathan sent an email to Dennis Oakley containing a letter detailing her history with the company, complaining about the fact that she had not received bonuses, and complaining that new employees she was required to train were starting at higher rates of pay than her. Regarding bonuses, she wrote, "I see no difference in my position and the ones performed by the grain department at Pendleton for example except the fact that I am female." It appears undisputed that

Oakley Grain's bonus policy treated outdoor workers as eligible for safety bonuses and workers at profitable facilities as eligible for harvest bonuses. Donathan argued in her letter that her duties included outdoor work such that she should have been bonus eligible. Defendants assert in this case that the Yellow Bend facility has never been profitable and that Donathan was not an outdoor worker.

Dennis Oakley forwarded the email to Porter about ten minutes after Donathan sent the email. Dennis Oakley then called Porter who had not yet read the email. After Porter took a moment to read Donathan's complaint, the men discussed the complaint. Porter asserts that, during the phone call, he told Dennis Oakley he was going to lay off employees to save money after finishing the intake of corn. According to Porter's deposition in this case, the Yellow Bend facility was to receive the final truckloads of corn from an outstanding order; Porter expected to complete that order soon; and a work slowdown was anticipated following completion of that order.

Approximately two hours later, still on January 23, Porter forwarded the email to an employee named Fletcher Calvert, a grain merchandiser for Oakley Grain at a different facility. Calvert almost immediately forwarded the email to J.O. Norman, an operations manager and merchandiser for Oakley Grain at a different facility. Calvert and Norman had no supervisory role over Donathan and generally did not work with Donathan. During depositions in this case, Porter denied knowledge as to why he had sent the email to Calvert or why Calvert would have sent the email to Norman. Donathan stated the atmosphere at work changed after she sent her email.

On the morning of Friday, January 31, 2014, eight days after Donathan sent her email to Dennis Oakley, Oakley Grain terminated the employment of five workers at Yellow Bend, including Donathan. Porter was not present on the morning of January 31; rather, he prepared typed notices and instructed another employee to deliver the notices. The notices thanked the terminated employees for their service, stated the

terminations were attributable to a lack of work, and indicated the company hoped it could employ the workers in the future. The notices did not instruct employees to work the remainder of the day nor did the notices instruct the employees to leave work immediately. Donathan's notice stated, "It is with regret that I inform you are being laid off from your position as a grader and weighier (sic) *effective January 31, 2014*."[1] (emphasis added). Donathan left after receiving the notice, but the other four affected workers remained at the facility for the rest of the day.

It is undisputed that, in prior years, Oakley Grain had laid off seasonal, non-office workers at Yellow Bend due to seasonal work demands. During Donathan's several years of employment, however, Oakley Grain had never laid off Donathan. Further, the woman who preceded Donathan in her position similarly had not been terminated with seasonal workers.

Of the five employees terminated on January 31, three were temporary outside workers and two were non-temporary or "regular" workers: Donathan and plant supervisor Doug Wilson. Oakley Grain admits it terminated Wilson at least in part due to performance concerns. Porter stated Wilson was a good worker, but did not possess the skills to serve in the particular maintenance-related job for which he was hired. Oakley Grain does not suggest it terminated Donathan for performance reasons. In a note to Dennis Oakley, Porter reported letting Wilson and Donathan go, but did not report letting the other three workers go. In response, Dennis Oakley stated, "laid off?" Porter responded, "Yes."

---

[1] A different version of the termination letter, provided by Oakley Grain to the EEOC in this matter stated merely "your position" and did not identify Donathan's position by title. Rather, it stated only, "It is with regret that I inform you are being laid off from your position effective January 31, 2014." In his deposition in this case, Porter stated he did not know why the documents were different.

The following Monday, February 3, 2014, Oakley Grain hired back the three temporary outside workers. Oakley Grain also hired a replacement for Donathan, Maggie Fletcher. Fletcher was not licensed to weigh and grade grain and did not possess experience similar to Donathan's. Oakley Grain admits Fletcher issued grain receipts bearing Donathan's name and asserts the receipts bore Donathan's name because the company's computer system automatically generated the receipts and the system had not been updated. Company emails, however, reveal employees discussing the fact that Fletcher actually forged Donathan's signature on handwritten grain slips and that Fletcher misspelled Donathan's name when doing so.[2] Fletcher remained continuously employed by Oakley Grain at the Yellow Bend facility at least through the date of Porter's deposition on July 27, 2015. The office position occupied by Donathan, therefore, was filled the first working day after Donathan's termination and remained filled thereafter.

Donathan filed an EEOC complaint, received a right-to-sue letter, and filed the present action. Donathan alleged wage discrimination and retaliation in violation of the Equal Pay Act, Title VII, and the Arkansas Civil Rights Act. The district court granted summary judgment on the discrimination claims, and Donathan does not appeal that ruling.

Regarding the retaliation claims, Defendants argued that Norman secured a new grain contract for delivery to Yellow Bend on the Saturday after Donathan's termination, thus creating a surprise new demand for labor at Yellow Bend. Defendants also argued the three seasonal laborers who had just been terminated were rehired, but Donathan was not rehired, because Donathan alone had failed to finish

[2]Oakley Grain notes that Donathan did not produce any of Oakley Grain's receipts. Donathan, however, asked for the grain receipts in discovery. Further, Oakley Grain does not suggest the company emails referencing Fletcher's handwritten receipts misspelling Donathan's name would be inadmissible evidence.

the workday on the Friday of the terminations. The district court concluded a jury would have to believe Defendants' version of the facts and granted summary judgment. Donathan appeals.

## II. Discussion

We review a grant of summary judgment de novo, viewing the record in the light most favorable to the non-moving party. Gibson v. Geithner, 776 F.3d 536, 539 (8th Cir. 2015). Viewing the record in this light means drawing inferences in favor of the non-moving party where the evidence as a whole would permit a rational trier of fact to do so. Ricci v. DeStefano, 557 U.S. 557, 586 (2009) ("Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial." (citation omitted)). The non-moving party, however, "may not rely on allegations or denials, but must demonstrate the existence of specific facts . . . supported by 'sufficient probative evidence [that] would permit a finding in [her] favor on more than mere speculation, conjecture, or fantasy.'" Mann v. Yarnell, 497 F.3d 822, 825 (8th Cir. 2007) (citation omitted) (quoting Gregory v. City of Rogers, 974 F.2d 1006, 1010 (8th Cir. 1992) (second alteration in original)).

"To survive a motion for summary judgment on a retaliation claim, [a plaintiff] must offer direct evidence of retaliation or create an inference of retaliation under the McDonnell Douglas burden-shifting framework." Hutton v. Maynard, 812 F.3d 679, 683 (8th Cir. 2016). "Direct evidence in this context is not the converse of circumstantial evidence . . . . Rather, direct . . . refers to the causal strength of the proof." Griffith v. City of Des Moines, 387 F.3d 733, 736 (8th Cir. 2004). The plaintiff's ultimate burden in a Title VII retaliation case is to prove an impermissible retaliatory motive was the "but-for cause" of the adverse employment action. Univ. of Tex. Sw. Med. Ctr. v. Nassar, 133 S. Ct. 2517, 2528 (2013) (rejecting the more

lenient "motivating factor" standard that applies to Title VII discrimination claims).[3] And we apply the familiar McDonald Douglas burden-shifting analysis even when the applicable standard of proof requires a showing of but-for causation. See Shirrell v. St. Francis Med. Ctr., 793 F.3d 881, 888 (8th Cir. 2015) (applying the McDonnell Douglas framework to a Title VII retaliation claim using the but-for standard articulated in Nassar.).

Pursuant to the burden-shifting analysis, the plaintiff bears the initial burden to establish a *prima facie* case. This burden requires the plaintiff to demonstrate she participated in protected conduct and suffered an adverse employment action. Musolf v. J.C. Penney Co., 773 F.3d 916, 918 (8th Cir. 2014). The plaintiff must also demonstrate a causal connection between the protected conduct and the adverse action. Id. "The burden to show a *prima facie* case is not difficult." Id. at 919.

As a means of focusing the balance of the court's analysis and the parties' arguments, the burden then shifts to the employer to articulate a legitimate, non-retaliatory reason for the adverse employment action. Torgerson v. City of Rochester, 643 F.3d 1031, 1046 (8th Cir. 2011) (en banc).

If the employer articulates a legitimate reason for the adverse employment action, the plaintiff may create a triable question as to retaliation by showing the employer's articulated reason was not the true reason for the adverse action. Id. On a fully developed summary judgment record, this final step of the burden-shifting

---

[3]The parties do not argue a more lenient standard applies under the state statute or the Equal Pay Act. Because we conclude Donathan defeats summary judgment even under the Nassar standard, we need not address these other claims separately.

analysis merges with the ultimate burden of proof which remains at all times on the plaintiff. Id.[4]

In the present case, it is undisputed that Donathan's letter complaining of unequal pay based on her sex was a protected act. It is also undisputed that Donathan suffered an adverse employment action. We note Defendants focus most of their argument on the failure to rehire on Monday, arguing Donathan's leaving on Friday provides the non-retaliatory reason for not rehiring her. Donathan, on the other hand, focuses on the Friday termination. We agree the alleged retaliatory act was the termination. The failure to rehire may also constitute retaliation, and the extent to which these acts may be separated and analyzed independently, or are interrelated, lies at the heart of the parties' theories of the case.

As to the *prima facie* question of causation, we conclude Donathan has met her burden. Donathan was terminated from her office position even though Oakley Grain had not included the office position in its seasonal layoffs any of the prior three years that Donathan had worked for the company (or during the years when Donathan's predecessor held the post). Donathan's termination occurred despite the absence of negative reviews, and Oakley Grain hired Fletcher to fill the position the very next

---

[4]Although our court occasionally notes that the burden-shifting framework need not be applied on a fully developed summary judgment record, the framing of arguments and logical inferences nevertheless remain the same. See, e.g., Hill v. Walker, 737 F.3d 1209, 1218–19 (8th Cir. 2013); Johnson v. Ready Mixed Concrete Co., 424 F.3d 806, 810 (8th Cir. 2005). The final step, regardless of how it is characterized, empowers the court to view the record with insight gained from the parties' articulation of their positions and in view of the employer's explanation for its actions. See, e.g., Malloy v. U.S. Postal Serv., 756 F.3d 1088, 1091–92 (8th Cir. 2014) (noting the fully developed nature of the summary judgment record, addressing the final step of "discrimination *vel non*" and analyzing the record in light of the employer's "core justification").

working day. Notably, Fletcher was not licensed to grade grain and had to forge Donathan's signature on grain slips.

In addition, temporal proximity serves as further and strong evidence of causation in the context of the present case. See, e.g., Bainbridge v. Loffredo Gardens, Inc., 378 F.3d 756, 761 (8th Cir. 2004) (temporal proximity of six days coupled with other evidence sufficient to create jury question). Dennis Oakley forwarded Donathan's letter to Porter upon receiving it and called Porter to discuss the letter even before Porter had viewed it. After a delay of just a few minutes for Porter to read the letter, the men discussed the letter, during which discussion Porter admittedly advised Dennis Oakley of the intent to lay off workers. A rational finder of fact could infer from the discussion of layoffs during the phone call about Donathan's letter that Porter and Dennis Oakley decided terminate Donathan's employment at that time—the same day as her protected act. Even taking the day of her termination as the date of the adverse action, however, a delay of a mere eight days in this case is strong evidence of causation in light of the other evidence. See Id.

Defendants' articulated rationale for laying off Donathan on Friday, January 31, 2014, was economic necessity tied to a seasonal downturn in grain intake. The articulated rationale for not rehiring Donathan the following working day, Monday, February 3, 2014, was the fact that Donathan had not completed the workday on January 31 after receiving her termination letter.

Donathan points to the evidence just discussed concerning her *prima facie* case and more to demonstrate the asserted rationales were not the true motivation for the adverse actions. For example, although Defendants argue Norman called in the surprise grain order on Saturday following the layoffs and workers were needed to process the new order, Defendants produced no contract to establish the timing of this "surprise" order. When asked about a written contract for a different order, Porter

-9-

responded that Oakley Grain would have a contract. When asked about a written contract for the asserted surprise order, Porter responded there was no written contract. Further, the fact that Norman was the merchandiser who purportedly secured the timely surprise order is material in light of Donathan's argument that Defendants are dissembling to hide a retaliatory motive. It is also material in light of the evidence that Norman was one of the people who received Donathan's letter even though he is not asserted to have had any supervisory authority over Donathan and did not work at the Yellow Bend facility.

Donathan also notes that, although Oakley Grain generally would lay off seasonal outdoor workers during annual slowdown, Oakley Grain took the opportunity of the January 31 layoffs to terminate plant supervisor Doug Wilson for performance reasons. This undisputed fact demonstrates the January 31 layoffs were not merely due to a post-harvest slowdown. And, after Porter had the layoff notices delivered, he reported to Dennis Oakley that he had laid off Donathan and Wilson, but did not mention that he had laid off the seasonal workers. A rational jury could conclude the motivations for terminating Donathan and Wilson were different than for the seasonal workers. And, because there is no evidence of poor reviews, poor performance, or other possible reasons for Donathan's termination beyond the purported work shortage and her protected act, a reasonable jury could conclude the protected act was the but-for cause of her termination.

Moreover, after Oakley Grain hired Fletcher out of purported necessity to address the surprise Saturday order, she remained in Donathan's position through at least July 2015. This strongly suggests Oakley Grain at no time intended to leave the office position unfilled. Rather, Oakley Grain's hiring *and subsequent long-term, continuous retention* of Fletcher in Donathan's position (notwithstanding Fletcher's shortcomings) corroborates Oakley Grain's desire to maintain the position at all times. This conclusion is wholly consistent with Oakley Grain's multi-year pattern

of protecting the office position through prior years' seasonal layoffs of non-office laborers.

It is also consistent with detailed deposition testimony from Porter. Porter admitted that, although he stated he terminated Donathan for "budget reasons," he could not recall how big the order for grain was that supposedly necessitated the hiring of Fletcher. He recalled, however, that the order was filled within "[a] few weeks," and that he didn't terminate Fletcher after the order was filled because "[a]t the time I was needing her . . . [for] [o]ffice work, someone to do the payroll, answer the phone." He also indicated that, from a time shortly after the Yellow Bend facility opened, the facility had never operated without an office employee to handle such tasks. In fact, in response to the question "And from day one to now, you have always had one person in the office," he stated, "Yeah, I try to keep one person in the office." Also, although Porter indicated he retained Fletcher for functions including payroll, it is undisputed that Fletcher had no payroll experience and could not perform payroll duties. A rational jury could easily conclude Defendants terminated Donathan in retaliation for her complaint and did so under the auspices of eliminating a position out of economic necessity all the while harboring the intent to keep her position continuously filled.

The parties spend much of their briefs arguing about the relative meaning and weight to be accorded temporal proximity. This issue, of course, is well trod territory so we need not dwell on it at length. Of note, however, are three points, all of which support a denial of summary judgment in the present case. First, there is no need to address the value of temporal proximity "standing alone" because temporal proximity does not stand alone in this case. Second, temporal proximity generally is of greater inferential weight when time frames are compressed. Whether we consider the time frame in this case to be ten minutes or eight days, it is a meaningful and compressed time frame. And third, our court has often expressed an inclination to discount temporal proximity due to the perceived risk that employees who anticipate discipline

-11-

or adverse actions might preemptively engage in protected conduct to complicate or forestall such discipline or to set the stage for later retaliation claims. See, e.g., Wilson v. Ark. Dept. of Human Servs., 850 F.3d 368, 376 (8th Cir. 2017) (Loken, J., concurring in part and dissenting in part) (interpreting the Nassar standard "as instructing lower courts to stop letting contrived retaliation claims hijack or delay legitimate employer performance decisions"); Hervey v. Cty. of Koochiching, 527 F.3d 711, 723 (8th Cir. 2008) ("Insubordinate employees may not insulate themselves from discipline by announcing an intention to claim discrimination just before the employer takes action."). The present record, however, is wholly devoid of evidence even remotely suggesting there existed any facts that might have given Donathan reason to anticipate discipline or adverse action. Her position had been repeatedly preserved through many years' seasonal layoffs of outdoor workers, and the only fair reading of the present record is that she was a valued employee who served many functions. Temporal proximity, therefore, is *more meaningful* in a case such as the present one where it is impossible to infer timing issues arise from an employee's calculated or strategic engagement in protected conduct.

Finally, to the extent Defendants attempt to divorce the Friday termination from the Monday failure to rehire, Defendants ask the court to impermissibly view the record in the light most favorable to the moving party. Defendants argue Donathan's failure to complete the workday on Friday was *intervening* unprotected conduct separate and apart from any earlier protected actions. Because we conclude a rational jury could find impermissible retaliatory animus was the but-for cause of Donathan's Friday termination, we cannot view the hiring decision the following working day on a clean slate. Nor can we view Donathan's failure to stay at Yellow Bend *after* receiving her termination letter as intervening conduct. Simply put, a reasonable jury could conclude the employer's Friday morning animus still drove the Monday decisions. This is especially true in light of the absence of evidence suggesting prior harsh discipline—or any discipline—of Donathan and in light of the *de minimis* nature of the purported infraction (leaving the workplace upon termination

-12-

when not having been asked to remain and when the termination letter itself listed that day's date as the effective date of the termination).[5]

We reverse the judgment of the district court.

---

[5]The dissent starts by discussing what issues have been appealed and those not appealed and thus waived. It then goes on to decide the case on the basis of an issue Defendants expressly conceded in the district court and that is neither appealed nor briefed. See Defendants' District Court Brief in Support of Summary Judgment at 9; Transcon. Ins. Co. v. W.G. Samuels Co., 370 F.3d 755, 758 (8th Cir. 2004) ("We may affirm a judgment on any ground *raised in the district court . . . .*") (emphasis added); see also Gunderson v. BNSF Ry Co., 850 F.3d 962, 972 (8th Cir. 2017) (Colloton, J., concurring in part and concurring in the judgment) ("The discussion . . . is pure *dicta*, on an issue raised *sua sponte* by my colleagues. Where the question is unnecessary to a decision, and without briefing or argument on the complex issues lurking therein, . . . I express no views . . . ."). The dissent argues there was no protected conduct and thus nothing to retaliate against. The district court, however, determined in its summary judgment order that "Plaintiff's complaint to Dennis Oakley . . . was a protected activity." Defendants did not challenge that holding in this appeal, and in fact conceded in their brief to our court, "Donathan sent an email alleging discrimination based upon her gender which is considered to be protected activity." Appellees' Brief, at 11. The whole thrust of Defendants' case was whether the subsequent layoff and refusal to rehire was done in retaliation for the protected conduct.

Because the issue was conceded in the district court, the evidentiary record on this issue is sparse. However, based on the record we do have, if we were to reach the issue of the reasonableness of Donathan's complaint to Dennis Oakley, summary judgment would not be appropriate. The dissent seems to equate reasonableness with success on the merits of the equal pay claim while professing that is not the standard it is applying. The facts as set forth in the district court opinion establish, at a minimum, a jury question as to the reasonableness of Donathan's complaint about the safety bonus. Safety bonuses were paid to non-office workers. Although the district court ultimately determined Donathan's job classification as "grain weigher/grader and office staff" precluded her from receiving a safety bonus, there is significant evidence in the record that Donathan performed numerous outside duties. Thus, the record supports, at a minimum, submitting the reasonableness issue to the jury.

-13-

COLLOTON, Circuit Judge, dissenting.

The district court concluded that Shana Donathan presented insufficient evidence to support a finding that Oakley Grain unlawfully retaliated against her because she opposed an unlawful employment practice. I would affirm the judgment dismissing her complaint on either of two alternative grounds.

Donathan complained about unequal pay based on sex at Oakley Grain in an e-mail to company president Dennis Oakley on January 23, 2014. Oakley Grain laid off five employees, including Donathan, on January 31, 2014. Donathan then brought this action and included claims alleging sex discrimination in wages. The district court ruled that Donathan did not establish a *prima facie* case of unlawful sex discrimination and dismissed those claims. Donathan did not appeal that ruling, and it is final.

Donathan also brought three "retaliation" claims based on Oakley Grain's decision to terminate her on January 31 and to refrain from rehiring her on February 3. One claim is based on Title VII of the Civil Rights Act. The majority never refers to statutory text, but the relevant provision states that it shall be an unlawful employment practice for an employer to discriminate against an employee "because [s]he has opposed any practice made an unlawful employment practice by this subchapter." 42 U.S.C. § 2000e-3(a).

Donathan claims that Oakley Grain discriminated against her because she opposed unequal pay based on sex at the company. In fact, however, the district court ruled that Oakley Grain did not engage in the unlawful employment practice that Donathan purported to oppose, and Donathan does not dispute that ruling. She did not, therefore, "oppose[] any practice" that was "made . . . unlawful" by Title VII. A reader examining the statutory text might naturally conclude that the absence of an

-14-

unlawful employment practice requires dismissal of Donathan's retaliation claim as well.

In 1981, however, this court ruled that "as long as the employee had a reasonable belief that what was being opposed constituted discrimination under Title VII, the claim of retaliation does not hinge upon a showing that the employer was in fact in violation of Title VII." *Sisco v. J.S. Alberici Constr. Co.*, 655 F.2d 146, 150 (8th Cir. 1981) (quoting *Hearth v. Metro. Transit Comm'n*, 436 F. Supp. 685, 688 (D. Minn. 1977)). The court adopted the decision of a district court which reasoned that requiring proof of opposition to a practice that was actually unlawful would chill informal opposition to perceived discrimination and unnecessarily encourage resort to formal complaints of discrimination to gain protection. *Hearth*, 436 F. Supp. at 688-89. Therefore, *Hearth* concluded, opposition is protected under Title VII "even if the employee turns out to be mistaken as to the facts." 436 F. Supp. at 689. *Sisco* also cited *Berg v. La Crosse Cooler Co.*, 612 F.2d 1041, 1045 (7th Cir. 1980), where the court acknowledged *Hearth*, rejected a "literal reading" of the statute, and invoked what *Holy Trinity Church v. United States*, 143 U.S. 457 (1892), described as the "familiar rule that a thing may be within the letter of the statute and yet not within the statute, because not within its spirit nor within the intention of its makers." *Id*. at 459; *see also Sias v. City Demonstration Agency*, 588 F.2d 692, 695 (9th Cir. 1978) (agreeing with *Hearth*).

It might be suggested that *Sisco* was a product of a different era in which fealty to text played a lesser role in statutory interpretation. The opinion, after all, followed the Seventh Circuit in *Berg*, which in turn relied on *Holy Trinity*, "a decision that the Supreme Court stopped relying on more than two decades ago." Antonin Scalia & Bryan A. Garner, *Reading Law: The Interpretation of Legal Texts* 12 (2012). But the Supreme Court, while noting the "reasonable belief" issue in *Clark County School District v. Breeden*, 532 U.S. 268 (2001) (per curiam), had "no occasion to rule on the

-15-

propriety of this interpretation." *Id*. at 270. *Sisco* therefore governs this panel as circuit precedent.

Even so, to prove a meritorious retaliation claim under Title VII, Donathan must show that her opposition to alleged sex discrimination in Oakley Grain's wages was objectively reasonable.[6] In determining whether an employee reasonably believed that an employer's conduct was unlawful, we must consider settled legal standards under Title VII. *See Breeden*, 532 U.S. at 270. Here, Donathan's allegation of sex discrimination in wages under Title VII is governed by the standards of the Equal Pay Act, 29 U.S.C. § 206(d). *Taylor v. White*, 321 F.3d 710, 715 (8th Cir. 2003). That law requires proof of unequal pay at the same establishment, where "establishment" is defined as "a distinct physical place of business" instead of a business enterprise. *Price v. N. States Power Co.*, 664 F.3d 1186, 1194 (8th Cir. 2011). "Only in unusual circumstances"—such as where a central administrative unit hires all employees, sets wages, and assigns the location of employment—"may two or more distinct physical portions of a business enterprise [be treated] as a single establishment." *Id.* (alteration in original) (internal quotations omitted).

---

[6]To be sure, Oakley Grain's defense throughout has been that Donathan was not laid off because she made allegations of discrimination. But the company did not, as the majority asserts, *ante*, at 13 n.5, "expressly concede" in the district court that Donathan's e-mail complaint was objectively reasonable or that it was protected activity under the statutes. The cited passage acknowledged a potential chilling effect but did not address the statutory element of reasonableness: "Defendants admit for purposes of this motion that if Plaintiff had been laid off for making allegations of discrimination then such adverse employment action would chill a person of ordinary firmness from continuing to bring such allegations to the attention of an employer." R. Doc. 28, at 9. The company's statement on appeal that Donathan's e-mail "is considered to be protected activity" referred with citation to the district court's conclusion on that point; it was not an express concession that the conclusion was correct. Appellee's Br. 11.

Oakley Grain operates five separate facilities in different locations. Donathan worked at the Yellow Bend establishment. Her alleged opposition to sex discrimination, set forth in the e-mail to Oakley Grain's president, raised questions about safety bonuses and harvest bonuses. She said: "I see no difference in my position and the ones performed by the grain department at Pendleton for example except the fact that I am a female."

Donathan did not complain about sex discrimination in wages at the same establishment. Nor did she cite any facts that would justify treating Oakley Grain's different physical places of business as one "establishment." Even when she later had an opportunity to develop the record in her lawsuit, Donathan continued to argue that the court should consider whether she was paid differently than men at *any* Oakley Grain facility. Yet the district court determined that there was no evidence "that any of the facilities served the same clients, that day to day decision making was done in one central location for all facilities, that employees were hired at a central location and stationed at different facilities, or that the facilities were even located close to each other."

No reasonable person could have believed that difference in bonus pay between an employee at Yellow Bend and an employee at Pendleton violated Title VII. This is not a case, like the situation posited in the font of the "reasonable belief" standard, where an employee reasonably believed that the employer was unlawfully discriminating, but ultimately was "mistaken as to the facts." *Hearth*, 436 F. Supp. at 689. The facts cited by Donathan in her e-mail did not support a reasonable belief that Oakley Grain was acting unlawfully.[7] We may affirm on any ground supported

_____

[7]There is no deficiency in the evidentiary record on protected activity, because Donathan's e-mail speaks for itself, and the reasonableness of her complaint is an objective legal question. *See Breeden*, 532 U.S. at 270-71. The majority, *ante*, at 13 n.5, mistakenly relies on facts and theories presented in the district court to find a jury question on whether Donathan's unsuccessful sex discrimination claim was

-17-

by the record, *United States v. Lucas*, 499 F.3d 769, 779 n.5 (8th Cir. 2007) (en banc), and dismissal of the Title VII retaliation claim could be affirmed on this alternative ground:  Oakley Grain did not discriminate against Donathan for opposing in her e-mail any practice that she reasonably believed was made an unlawful employment practice by Title VII.[8]

The second retaliation claim is based on the Arkansas Civil Rights Act.  This statute forbids discrimination against any individual "because such individual in good faith has opposed any act or practice made unlawful by this subchapter."  Ark. Code Ann. § 16-123-108(a).  The Arkansas Supreme Court apparently has not elaborated on this standard, but the plain language suggests that a plaintiff seeking to prove unlawful retaliation must have opposed an act or practice that is unlawful under the ACRA.  As written, the phrase "good faith" modifies the employee's *opposition* to an act or practice made unlawful by the statute; it does not modify the employee's *belief* about whether an act or practice is unlawful.  Under the plain language of the Arkansas statute, therefore, the absence of an unlawful act or practice would defeat

---

reasonable.  The relevant issue on the retaliation claim is the reasonableness of Donathan's *e-mail complaint*, which was based on a comparison of her position at Yellow Bend and positions in the grain department at Pendleton.  *Ante*, at 2.

[8] *Transcontinental Insurance Co. v. W.G. Samuels Co.*, 370 F.3d 755, 758 (8th Cir. 2004), cited by the majority, *ante*, at 13 n.5, said that this court may affirm on any ground raised in the district court, but did not limit the court's authority to affirm on other grounds supported by the record.  *See, e.g.*, *United States v. Filker*, 972 F.2d 240, 242 (8th Cir. 1992) (explaining that "an appellate court can affirm a judgment on any grounds supported by the record, whether or not raised by the parties in the district court"); *id*. at 242 n.2 ("If this court may *reverse* a district court on an issue not raised by the parties, *a fortiori* it may affirm on the basis of an unraised issue."). Any such limitation, moreover, would have been superseded by the en banc decision in *Lucas*, 499 F.3d at 779 n.5.  By definition, the "pure *dicta*" in *Gunderson v. BNSF Railway Co.*, 850 F.3d 962, 971-72 (8th Cir. 2017), did not state a rationale for affirming the district court, so the debate in that case is beside the point here.

Donathan's retaliation claim. Even assuming, however, that the ACRA incorporates a "reasonable belief" standard consistent with Eighth Circuit decisions under Title VII, *see Helton v. Southland Racing Corp.*, 600 F.3d 954, 960-61 (8th Cir. 2010) (per curiam), Donathan's ACRA claim fails like her claim under Title VII. The ACRA's prohibition on sex discrimination appears to be consistent with the prohibition under Title VII, *see McCullough v. University of Arkansas for Medical Sciences*, 559 F.3d 855, 860 (8th Cir. 2009); *Flentje v. First Nat'l Bank of Wynne*, 11 S.W.3d 531, 534-35 (Ark. 2000), so it was likewise unreasonable to believe that Oakley Grain's bonus payments violated the ACRA.

Donathan's third retaliation claim is based on the Fair Labor Standards Act. This statute makes it unlawful "to discharge or in any other manner discriminate against any employee because such employee has filed any complaint . . . under or related to this chapter." 29 U.S.C. § 215(a)(3). The Equal Pay Act is part of the FLSA, and Donathan's e-mail to Dennis Oakley likely constituted a complaint that asserted a violation of the statute. *See Kasten v. Saint-Gobain Performance Plastics Corp.*, 563 U.S. 1, 14 (2011). Although the text of the retaliation provision does not say that the employee's complaint must be supported by a reasonable belief that an employer was violating the Act, our precedent appears to have imposed that requirement. *Brennan v. Maxey's Yamaha, Inc.*, 513 F.2d 179, 181 (8th Cir. 1975); *see Love v. RE/MAX of Am., Inc.*, 738 F.2d 383, 387 (10th Cir. 1984). Applying that standard, Donathan's retaliation claim under the FLSA—like her claim under Title VII—fails for lack of a reasonable belief that Oakley Grain's bonus payments violated the Equal Pay Act.

While it is worth avoiding a blithe assumption that Donathan engaged in activity that was protected under the statutes, I would also affirm the judgment on the ground applied by the district court. Even assuming that Donathan undertook protected activity, the district court correctly determined that there was insufficient evidence that Oakley Grain discriminated against her because of her opposition or

complaint in the e-mail to Dennis Oakley.  The majority's contrary conclusion relies on factual assumptions that are too speculative to survive summary judgment.

The majority's theory of a submissible case is that Oakley Grain determined to retaliate against Donathan because of her e-mail on January 23.  The decision supposedly was reached in a telephone call between the company president and a facility manager ten minutes after Donathan's e-mail.  The company then concocted an unnecessary layoff of five employees, including Donathan and Maggie Fletcher, on Friday, January 31.  The plan allegedly was to rehire three of them on the next business day, Monday, February 3, based on a phony "surprise" grain order to be received on Saturday, February 1.  Because the company required one permanent office employee, the company's scheme included a plot to rehire Fletcher rather than Donathan, and to cite Donathan's early departure from work on Friday as the justification to prefer Fletcher.

This scenario is too far-fetched to support a reasonable finding that retaliatory motive was the but-for cause of the company's adverse action against Donathan.  The majority leaps to a conclusion about a discriminatory decision to terminate Donathan based on unremarkable communications between company president Dennis Oakley and Yellow Bend manager Charlie Porter.  When an employee writes to the company president with complaints about management at a facility, it is hardly suspicious that the president promptly notifies the manager of the facility and solicits his response. Responsive management does not support an inference of discrimination.  As for the rehiring of employees after the layoff, there is no evidence to refute the company's showing that the grain order on Saturday was legitimate and unexpected.  The majority highlights that there was no written contract for this order that would show its timing, but there is nothing in the record to show that the Saturday grain order was

treated differently from similar orders. The majority mischaracterizes Porter's testimony on this point.[9]

The notion that Oakley Grain knew all along that it would maintain an office position and schemed for a reason to replace Donathan with Fletcher unreasonably assumes clairvoyance by the company. There was no way to know before January 31 that Fletcher would voluntarily work a full day while Donathan would leave in the morning. The majority appears distracted by whether Donathan's early departure on Friday was an "infraction" or inconsistent with the termination letter. The salient point, however, is not that Donathan violated any rule by departing early on Friday, but that Fletcher showed extra commitment to the company by staying. Donathan acknowledged that she would have been paid for working, and she knew that others were going to finish their shifts. In making its rehiring decisions, the company properly could favor a former employee who pitched in to assist the business on the day of the layoff over one who opted to leave at the first opportunity. Loyalty surely is a legitimate nondiscriminatory reason to prefer one former employee over another.

Stripped of speculative inferences, the majority opinion is a victory for inferring retaliatory intent from temporal proximity. *See Hervey v. County of Koochiching*, 527 F.3d 711, 727 (8th Cir. 2008) (Melloy, J., dissenting). The layoffs occurred eight days after Donathan's e-mail to Oakley. But there is little else to support a finding that the company terminated her and then declined to rehire her because of her opposition to alleged sex discrimination in wages. The company

---

[9]Porter testified that Oakley Grain had a contract for the surprise grain order and had a previous contract. He explained that there was no e-mail or writing that evidenced the surprise contract because it happened on a weekend. Donathan's counsel never elicited a response to his question about whether there was an e-mail or writing that evidenced the previous contract. App. 111, pp. 40-41. There is no evidence, moreover, that the previous contract arose from an unexpected telephone order on a weekend, so a disparity in writings would not tend to show that the surprise contract or its timing was fabricated.

proffered legitimate nondiscriminatory reasons for the layoff (reduced workload and budget constraints), for the prompt rehiring of some who were laid off (a surprise weekend grain order), and for the rehiring of Fletcher rather than Donathan (demonstrated loyalty by working on the day of the layoff). To show that a company's stated legitimate reasons are a pretext for retaliatory motive, an employee must present appreciable evidence beyond a temporal connection between the adverse action and alleged opposition to discrimination. *Hervey*, 527 F.3d at 726; *Green v. Franklin Nat'l Bank*, 459 F.3d 903, 916 (8th Cir. 2006). Donathan failed to do so here.

For these reasons, I would affirm the judgment.

_____